UNITED STATES of America, et al., Plaintiffs,

v.

State of WASHINGTON, et al., Defendants.

Case No. 70–9213.

United States District Court, W.D. Washington, at Seattle.

COMPILATION OF MAJOR POST–TRIAL SUBSTANTIVE ORDERS (January 1, 2007 through December 31, 2007)

See appellate decision, 590 F.3d 1020.

Colleen Kelley, United States Department of the Interior, Portland, OR, Vanessa Boyd Willard, U.S. Department of Justice, Denver, CO, John William Ogan, Karnopp Petersen LLP, Bend, OR, Riyaz Amir Kanji, Kanji & Katzen, Ann Arbor, MI, James Rittenhouse Bellis, Suquamish Tribe, Suquamish, WA, Kerry Jane Keefe, U.S. Attorney's Office, Jane Garrett Steadman, Phillip Evan Katzen, Kanji & Katzen, Eric J. Nielsen, Nielsen Broman & Koch, Seattle, WA, Fawn R. Sharp, Tribal Attorney, Taholah, WA, Katherine K. Krueger, Quileute Natural Resources, Lapush, WA, Lori Ellen Nies, Raymond G. Dodge, Jr., Tribal Attorney, Skokomish Nation, WA, Emily Rae Hutchinson Haley, Swinomish Indian Tribal Community, James Miller Jannetta, Office of the Tribal Attorney, Laconner, WA, for Plaintiffs.

Bryce E. Brown, Jr., Transportation & Public Construction, Joseph V. Panesko, Michael S. Grossmann, Attorney General's Office, Rene David Tomisser, Laura J. Watson, Noah Guzzo Purcell, Philip Michael Ferester, Terence A. Pruit, Olympia, WA, for Defendants.

## TABLE OF CONTENTS

| ORDER | PAGE |
|---|---|
| Minute Order (1/3/07) | 831 |
| Order on Motions for Summary Judgment (1/3/07) | 831 |
| Order on Motion for Reconsideration (1/17/07) | 841 |
| Stipulation of Plaintiffs and State of Washington regarding Scope of Subproceeding, and Order (1/29/07) | 845 |
| Joint Motion for Order and Consent Decree Approving Settlement Agreement (6/20/07) Order and Consent Decree Approving Settlement Agreement (6/21/07) | 845 |
| Joint Motion for Order Approving Consent Decree and Settlement Agreement (6/29/07) | 874 |
| Joint Motion for Order Approving Consent Decree and Settlement Agreement re Manila Clams, Native Littleneck Clams and Pacific Oysters (6/29/07) | 881 |
| Order Approving Consent Decree and Settlement Agreement (7/11/07) | 889 |
| Order Approving Consent Decree and Settelement Agreement re Manila Clams, Native Littleneck Clams and Pacific Oysters (7/11/07) | 889 |
| Order on Cross–Motion for Summary Judgment (8/22/07) | 889 |

COMPILATION OF MAJOR POST-
TRIAL SUBSTANTIVE ORDERS
(Through December 31, 2007)

## MINUTE ORDER

Subproceeding 05–02

(January 3, 2007)

RICARDO S. MARTINEZ, District
Judge.

The following Minute Order is made by
direction of the Court, the Honorable Ri-
cardo S. Martinez, United States District
Judge:

The motion for reconsideration filed by
the Lummi Nation and Swinomish Indian
Tribal Community (Dkt. # 96) is GRANT-
ED. The Court hereby amends the lan-
guage of the Court's Order dated Novem-
ber 21, 2006, to read as follows:

> The Lower Elwha argued, in opposition
> to dismissal, that a race fishery in Hood
> Canal would result in destruction of the
> resource through a "tragedy of the com-
> mons." This cannot occur, however, be-
> cause the total harvest of each stock is
> subject to conservation regulation. See,
> inter alia, Stipulation and Order Adopt-
> ing Shellfish Implementation Plan, Dkt.
> # 17340; Order Adopting Puget Sound
> Salmon Management Plan, Dkt.
> # 10180; U.S. v. Washington, 384
> F.Supp. 312, 402 (W.D.Wash.1974); Pu-
> yallup Tribe v. Department of Game,
> 433 U.S. 165, 177, 97 S.Ct. 2616, 53
> L.Ed.2d 667 (1977).

1. The Upper Skagit originally defined the case
area as Saratoga Passage, from the Green-
bank Line north to the Snatelum Point Line,
and Skagit Bay. The Swinomish cross-request
defines the case area for their purposes as
Catch Reporting Area 24C. The case area,
then, encompasses that portion of Saratoga

## ORDER ON MOTIONS FOR
## SUMMARY JUDGMENT

Subproceeding No. 05–3

(January 3, 2007)

This subproceeding was initiated as a
Request for Determination ("Request")
filed by the Upper Skagit Indian Tribe
("Upper Skagit"), asking the Court to de-
termine that certain areas known as Sara-
toga Passage and Skagit Bay, on the east-
ern side of Whidbey Island, are not within
the usual and accustomed fishing area ("U
& A") of the Suquamish Indian Tribe ("Su-
quamish") as it was defined in U.S. v.
Washington, 459 F.Supp. 1020 (1978). A
Cross–Request for Determination was
filed, with leave of Court, by the Swinom-
ish Indian Tribal Community ("Swinom-
ish"), essentially joining in the Request of
the Upper Skagit.[1] The Suquamish filed
an Answer opposing both Requests. The
matter is now before the Court for consid-
eration of summary judgment motions
filed by the three parties. Oral argument
was heard on December 12, 2006, and the
arguments and memoranda of the parties,
and other Tribes who appeared as inter-
ested parties, have been fully considered.
As the three motions argue the same
points and issues, they shall be discussed
together.

## BACKGROUND

In 1975, in the language that lies at the
heart of this dispute, U.S. District Court
Judge George Boldt described the U & A
of the Suquamish as

> the marine waters of Puget Sound from
> the northern tip of Vashon Island to the

Passage within Catch Reporting Area 24C,
plus Skagit Bay (Catch Reporting Area 24A).
For convenience, this case area will simply be
referred to interchangeably as Saratoga Pas-
sage and Skagit Bay, or as the "subproceed-
ing area."

Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

Finding of Fact # 5 ("FF 5"), *U.S. v. Washington,* 459 F.Supp. 1020, 1049 (1978). The Upper Skagit and Swinomish assert in their separate Requests for Determination that this language is ambiguous as to certain waters lying on the eastern side of Whidbey Island, known as Saratoga Passage and Skagit Bay. They ask for a determination that the Suquamish U & A does not include these areas. The Suquamish, in answering the Request, contend that this language is not ambiguous, and that it unambiguously includes the contested areas.

The Court has ruled previously that there is sufficient ambiguity surrounding Judge Boldt's use of the term "Puget Sound" in describing the Suquamish U & A to require clarification, thus allowing this subproceeding to go forward. Dkt. # 43, pp. 2–3; Dkt. # 71, n. 2. In a later Order, the Court set out a two-step procedure for reaching an understanding of Judge Boldt's intent. Referring to prior decisions of the Ninth Circuit Court of Appeals known as *Muckleshoot I* (*Muckleshoot Indian Tribe, et al. v. Lummi Indian Tribe,* 141 F.3d 1355 (9th Cir.1998)), *Muckleshoot II* (*Muckleshoot Indian Tribe v. Lummi Indian Nation,* 234 F.3d 1099 (9th Cir.2000)), and *Muckleshoot III* (*Puyallup Indian Tribe, et al. v. Muckleshoot Indian Tribe,* 235 F.3d 429 (9th Cir.2000)), the Court stated,

> These rulings inform this Court's decision on the motion to compel, as they define the scope of discovery in this matter. The burden in this subproceeding is on the requesting parties—the Upper Skagit and the Swinomish Tribal Community—to offer evidence that FF 5 is ambiguous, or that Judge Boldt "intended something other than its apparent meaning." *Id.* [citing to *Muckleshoot I,* 141 F.3d at 1359.] Since the apparent meaning of the phrase "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits . . . ." is in dispute here, it must be determined by the Court. **The relevant evidence on this issue is evidence which indicates the contemporary understanding of the extent of "the marine waters of Puget Sound . . .",** which will "shed light on the understanding that Judge Boldt had of the geography at the time." *Muckleshoot I,* 141 F.3d at 1360; *Muckleshoot II,* 234 F.3d at 1100. This may be provided by supplementation of the record, at the appropriate time, with declarations of geography experts. *Id.* Such evidence may be offered by the parties to "enable the district court to interpret the decree in specific geographic terms." *Muckleshoot I,* 141 F.3d at 1360.
>
> Should the evidence show that the common understanding of the term "Puget Sound" in 1974 included Saratoga Passage and Skagit Bay, the Upper Skagit or Swinomish Tribe must produce evidence that suggests that Judge Boldt intended something other than this apparent meaning when he wrote FF 5. *Muckleshoot I,* 141 F.3d at 1359. **The evidence that is relevant to Judge Boldt's intent comprises "the entire record before the issuing court and the findings of fact [which] may be referenced in determining what was decided."** *Muckleshoot I,* 141 F.3d at 1359.

Dkt. # 71 (emphasis added).

## ANALYSIS

### A. Ambiguity and Apparent Meaning

The first step, as set forth above, is to determine whether Judge Boldt's language

is actually ambiguous. The Skagit and Swinomish assert that it is; the Suquamish contend that it is not. The Skagit and Swinomish counter that Suquamish should be estopped from asserting unambiguity, because they have in the past, in other subproceedings, argued that the term is ambiguous.

As the Court has stated previously, it is not the meaning of "Puget Sound" that is at issue here, but rather its use by Judge Boldt in describing that portion of Puget Sound that constitutes the Suquamish U & A. That is, the term must be viewed in context: "the marine waters of Puget Sound from the tip of Vashon Island to the mouth of the Fraser River."

Black's Dictionary defines "ambiguity" as:

> Doubtfulness; doubleness of meaning. Duplicity, indistinctness, or uncertainty of meaning of an expression used in a written instrument. Want of clearness or definiteness; difficult to comprehend or distinguish; of doubtful import.
>
> . . . .
>
> Ambiguity of language is to be distinguished from unintelligibility and inaccuracy, for words cannot be said to be ambiguous unless their signification seems doubtful and uncertain to persons of competent skill and knowledge to understand them. . . . .
>
> It is *latent* where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings, as where a description apparently plain and unambiguous is shown to fit different pieces of property. A *patent* ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used.

*Black's Law Dictionary,* 5th ed., abridged, p. 41.

The Upper Skagit and Swinomish assert that the Court has already determined that Judge Boldt's language in describing the Suquamish U & A is ambiguous, and that such determination is the law of the case. However, the Court's previous ruling was not that the language was ambiguous, but rather that there was sufficient ambiguity "surrounding" Judge Boldt's language to justify clarification. While a latent ambiguity may have arisen later from various judges'. and parties' imprecise use or differing understanding of the term "Puget Sound", it is the possible ambiguity in Judge Boldt's use of the term in 1975 that is at issue here.

In support of their contention that the language is not ambiguous, the Suquamish point to various places in the record where "Puget Sound" was actually defined by the Court. Specifically, Judge Boldt expressly adopted the definition of Puget Sound set forth in the "Joint Statement Regarding the Biology, Status, Management, and Harvest of the Salmon and Steelhead Resources of the Puget Sound and Olympic Peninsula Drainage Area of Western Washington", Exhibit JX–2a from the original *U.S. v. Washington* proceedings. That definition states: "As used in this report (except where the context clearly indicates otherwise) the term 'Puget Sound' includes the Strait of Juan de Fuca and **all saltwater areas inland therefrom,** . . ." Ex. JX–2a, p. i. (emphasis added). Judge Boldt expressly adopted this definition in his Findings of Fact in *Washington I*. Referring to the facts set forth·in the report, he stated, "The contents of said report are hereby incorporated by reference as Findings of Fact herein." *Washington I*, 384 F.Supp. 312, 338 (W.D.Wash. 1974). This became Finding of Fact 164.

*Id.* The contents of the report necessarily include the definitions.

The Skagit and Swinomish attempt to minimize the significance of this report by characterizing it as simply a fisheries management tool. However, this case arose out of fisheries management in Washington State, and tribal participation therein. Judge Boldt's understanding and use of the term "Puget Sound" would necessarily have been shaped by the fisheries reports and regulations that were under discussion at that time. It was therefore reasonable for the Court to consider and adopt the terminology used in fisheries management in discussing the case area.

This was not Judge Boldt's only reference to Puget Sound as a broad area encompassing all the saltwater areas inward from the entrance to the Strait of Juan de Fuca. This same broad definition was used on defining the case area in Conclusion of Law # 7:

> This case is limited to the claimed treaty-secured off-reservation fishing rights of the Plaintiff tribes as they apply to areas of the Western District of Washington within the watershed of Puget Sound and the Olympic Peninsula north of Grays Harbor, and in the adjacent offshore waters which are within the jurisdiction of the State of Washington.

*U.S. v. Washington,* 384 F.Supp. at 400. This language is taken verbatim from ¶ 5 of the Final Pretrial Order ("PTO"), Dkt. # 353, p. 5. This PTO was signed by all the parties to the case at that time, including the Upper Skagit, and approved by Judge Boldt

The parties' and the Court's common understanding of the extent of Puget Sound is indicated once again later in the PTO:

> Each of the Plaintiff tribes has usual and accustomed fishing places within the area described in paragraph 5 supra, including, among others, the waters of Puget Sound, Strait of Juan de Fuca, off-shore marine waters, the Nisqually River, the Puyallup River and Commencement Bay, the White River, the Green–Duwamish River, Lake Washington, Cedar River, Stillaguamish River, Sauk River, Skagit River, the Nooksack River, the waters of Hood Canal and the rivers flowing into said Canal, the Hoko River, the Quilayute River and its tributaries, and the Hoh River.

Final Pretrial Order ¶ 7–14, Dkt. # 353, p. 122. In designating only the Strait of Juan de Fuca and Hood Canal as separate areas, this language necessarily subsumes the other bays and inlets, including the areas at issue here, into Puget Sound, as the term was used in this case.[2]

The Court notes that the very maps used by the parties, admitted as exhibits by the Court on April 10, 1975 in the herring fisheries proceedings, also indicate a very broad region as Puget Sound. The maps themselves are National Oceanic and Atmospheric Administration ("NOAA") nautical maps with separate designations for each bay and inlet. Exhibit JX–3, JX–4. However, written by the parties in large letters on each map are the designations "Central and Southern Puget Sound" (Ex-

---

**2.** The Court has ruled previously that this subproceeding will not address the western boundary of the Suquamish U & A, and therefore quotes these various definitions without making any finding as to whether the Strait of Juan de Fuca is included within "Puget Sound" as that term was used by Judge Boldt in the Suquamish U & A. However, the Ninth

Circuit Court of Appeals has ruled previously, with respect to the Lummi U & A, that "[i]t is clear that Judge Boldt viewed Puget Sound and the Strait of Juan de Fuca as two distinct regions, with the Strait lying to the west of the Sound." *U.S. v. Lummi Indian Tribe,* 235 F.3d 443, 451–52 (9th Cir.2000).

hibit JX–3) and "Northern Puget Sound" (Exhibit JX–4). Thus, the map labeled by NOAA as "Strait of Georgia and Strait of Juan de Fuca" is designated by the parties as Northern Puget Sound. Exhibit JX–4. Similarly, the map labeled by NOAA as depicting "Admiralty Inlet and Puget Sound" is designated by the parties as Central and Southern Puget Sound. These handwritten designations on these maps are specific to this case, and indicate that the terms used and understood by the parties and the Court in the April, 1975 proceedings were Southern, Central, and Northern Puget Sound, rather than the NOAA designation of separate bays and inlets. The handwritten labels on these maps are thus highly significant to an understanding of Judge Bolt's use of the term "Puget Sound" during the 1975 proceedings.

These definitions, maps, and references support the conclusion that in 1975 the parties and the Court had a common understanding of Puget Sound as the case area, encompassing all the saltwater areas inward from the mouth of the Strait of Juan de Fuca. Indeed, Judge Boldt so stated in September 1975, five months after the ruling at issue here, in addressing the coho salmon fishery:

> As used in this Order the term "Puget Sound", when referring to the waters of origin or the place of salmon harvest, includes all the marine waters of Washington inland from the mouth of the Strait of Juan de Fuca (Tatoosh Island) together with the freshwater streams and lakes draining into such marine waters.

Order dated September 13, 1975, Dkt. # 1381. The Skagit and Swinomish assert that the language in this Order may not be considered, because the Court has limited the evidence under consideration in this subproceeding to that which was before the Court in April of 1975. However, this cited Order is not "evidence" within the meaning of that limiting rule, and it may therefore be considered as yet another indication of Judge Boldt's understanding, in 1975, of the extent of Puget Sound for the purposes of this case. As noted, in every instance in 1975 where Judge Boldt did state a definition for Puget Sound, it is a broad one which necessarily includes both Saratoga Passage and Skagit Bay.

Indeed, that conclusion is the only logical one, in light of Judge Boldt's description, in the very paragraph following the Suquamish U & A description, of the U & A of the Swinomish:

> The usual and accustomed fishing places of the Swinomish Tribal Community include the Skagit River and its tributaries, the Samish River and its tributaries and the marine areas of northern Puget Sound from the Fraser River south to and including Whidbey, Camano, Fidalgo, Guemes, Samish, Cypress, and the San Juan Islands, and including Bellingham Bay and Hale Passage adjacent to Lummi Island.

Finding of Fact # 6, *U.S. v. Washington,* 459 F.Supp. at 1049. This description, issued the same day and in the same Order as the Suquamish U & A, necessarily includes Skagit Bay and Saratoga Passage as within the "marine waters of northern Puget Sound", and within the U & A of the Swinomish.

Earlier, the Court invited the parties, pursuant to direction given in *Muckleshoot I,* to supplement the record, if appropriate, with declarations of geography experts in order to aid the Court in interpreting the language of the Suquamish U & A in specific geographic terms. Dkt. # 71, citing *Muckleshoot I,* 141 F.3d at 1360. In light of the definitions in the record itself, and the maps known to be used by the Court as cited above, the Court now deems it

unnecessary and inappropriate to turn to extrinsic evidence in order to fathom Judge Boldt's meaning. This is particularly so in view of the lack of any evidence that Judge Boldt consulted a geography expert for definitions of the geographical terms he used; instead it appears that the terms were defined by the fisheries consultants.

Even if the Court were to consider the extrinsic evidence offered, and could find it relevant to Judge Boldt's understanding, it would find that the experts' opinions here are not based upon sufficient facts and data, and do not adequately reflect the application of scientific methods to the facts of this case. F.R.Evid. 702. The Upper Skagit and Swinomish experts Richard Hart and Theresa Trebon (both of whom are historians, not geography experts) examined historical maps, journals, dictionaries, atlases, and other sources. They both noted that the meaning of "Puget Sound" has changed over the years, from the original naming by Captain George Vancouver of the area at the southernmost end of the waterway. They both advanced the opinion that in 1975, as indicated on contemporary maps and charts, the term was generally used to describe the waters from the southern end up to (but not including) Admiralty Inlet. This opinion is clearly incompatible with Judge Boldt's own language in describing the Suquamish and Swinomish U & A's, which viewed Puget Sound as extending all the way north to the mouth of the Fraser River. The historians' opinions must therefore be disregarded as useless in shedding light on Judge Boldt's understanding of the extent of Puget Sound.

Moreover, it appears that neither historian consulted the official United States Geological Survey ("USGS") definition of Puget Sound, which would have been a highly reliable source to consult, and more precise than maps.[3] The Suquamish earlier asked the Court to take judicial notice of this official USGS definition of Puget Sound:

> Bay, with numerous channels and branches, [which] extends 144 km S from the Strait of Juan de Fuca to Olympia; the N boundary is formed, at its main entrance, by a line between Point Wilson on the Olympic Peninsula and Partridge on Whidbey Island; at a second entrance, by a line between West Point on Whidbey Island, Deception Island, and Rosario Head on Fidalgo Island; at a third entrance, the S end of Swinomish Channel between Fidalgo Island and McGlinn Island.

U.S. Department of the Interior, *USGS Geographic Names Information System,* quoted at Dkt. # 6, p. 12. This "official" USGS definition of Puget Sound includes Saratoga Passage and Skagit Bay, which lie just south of the second-and third-named entrances. However, it appears that this definition was adopted in 1979, and no copy of the earlier version, adopted in 1961, has been presented to the Court. Therefore, the Court cites this definition here only as a basis for disregarding the experts' opinions as insufficiently grounded in facts and data.

Similarly, it appears that neither historian consulted the Washington Administrative Code, which in 1975 codified many of the tribal fishing regulations, area by area,

3. In viewing maps and charts presented in this subproceeding, the Court finds maps to be an imprecise indicator of the boundaries of water areas. When bays and inlets are labeled on the map, it cannot be determined whether they are designated as parts of a greater whole (Puget Sound), or as separate areas which are not part of the whole. A written description with set boundaries is more informative on the question of the boundaries of a body of water.

and could have shed some meaningful light on the question. Washington Administrative Code ("WAC") 220–47–001 *et seq.* Indeed, the Exhibit JX–2a definition, adopted by Judge Boldt, mirrored the definition stated in these regulations:

> The term "Puget Sound" shall be construed to include all the waters of Puget Sound outside the mouth of any river or stream including the Strait of Juan de Fuca, Georgia Strait, and all bays and inlets thereof.

WAC 220–16–210 (adopted 1969). Copies of certain regulations, namely WAC 220–47–206 through 220–47–268, defining the boundaries of various Puget Sound fishing areas, were provided to the Court by the Upper Skagit, in support of their motion. Declaration of David Hawkins, Dkt. # 144 Exhibit C, pp. 14–19. The definition of Puget Sound applicable to these regulations, quoted above, was not provided. However, the parties agreed with the Court at oral argument that the Court may take judicial notice of the WACs. Here, the Court does so only for the purpose of pointing out deficiencies in the facts and resources researched by the two experts.

The Suquamish also presented the declaration of an expert, geographer Dr. Jon Kimerling. The Skagit in their reply asked the Court to strike Dr. Kimerling's opinion because he was identified only as a rebuttal witness, not in the original designation of experts. The Suquamish did not file a surreply to oppose the motion to strike. The Court therefore grants the motion to strike those portions of Dr. Kimerling's report which offer direct, as opposed to rebuttal, testimony.

██ Based on the discussion above, the Court finds that Judge Boldt demonstrated his understanding of the extent of Puget Sound by defining it in the record, and it is not appropriate to resort to extrinsic evidence to determine his meaning. As Judge Boldt defined Puget Sound as the case area, it includes the waters of Saratoga Passage and Skagit Bay.

### B. Judge Boldt's Intent

The determination that Judge Boldt in 1975 defined the term "Puget Sound" broadly, to include the disputed area here, does not end the inquiry. Under the rules developed by the Ninth Circuit, the Court must look to the actual evidence that was before Judge Boldt to determine if it "suggests that Judge Boldt intended something other than this apparent meaning when he wrote FF 5." *Muckleshoot I,* 141 F.3d at 1359. In this inquiry, the burden is on the Upper Skagit and the Swinomish to demonstrate that there was no evidence before Judge Boldt that the Suquamish fished on the east side of Whidbey Island, or traveled through there on their way up to the San Juans and the Fraser River area.

Both this Court and the Ninth Circuit Court of Appeals have noted on several occasions that Judge Boldt relied heavily on the reports and testimony of anthropologist Dr. Barbara Lane in determining the U & A's of various tribes. *Muckleshoot I,* 141 F.3d at 1359 (Dr. Lane's report was cited and heavily relied upon by Judge Boldt in his decision); *Muckleshoot III,* 235 F.3d at 437 (Judge Boldt specifically noted that Dr. Lane's testimony prevails over that of expert Dr. Riley in the event of a conflict). ·

Dr. Lane's report on the Suquamish is titled "Identity, Treaty Status and Fisheries of the Suquamish Tribe of the Fort Madison Reservation" ("Report"). It was admitted as an exhibit on April 9, 1975. Dr. Lane testified in that day's proceedings, and the transcript of her testimony appears in the record at Docket # 7268 ("Transcript"). In both her report and her

testimony, Dr. Lane characterized the Suquamish as a people who traveled widely by canoe, ranging as far north as the mouth of the Fraser River. She also stated that "[i]t was normal for all the Indians in western Washington to travel extensively either harvesting resources or visiting in-laws, ... visiting for social occasions such as potlatches, weddings, feasts ... or inter-community ceremonials or celebrations." Transcript, p. 48.

In the section of her report devoted to fisheries, Dr. Lane stated that the Suquamish fished for fall and winter salmon at the mouths of the Duwamish and Snohomish Rivers, and in the "adjacent marine areas." Report, p. 15. In the spring and summer, they traveled by canoe as far north as Fort Langley on the Fraser River. *Id.* Dr. Lane stated,

> In my opinion, the evidence that the Suquamish travelled [sic] to the Fraser river [sic] in pre-treaty times documents their capability to travel widely over the marine waters in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits. According to oral tradition, the Suquamish regularly travelled through the San Juan Islands and to the Fraser river.
>
> The Fort Langley journal documents that the Suquamish did travel .to the Fraser river. It is my opinion that the Suquamish undoubtedly would have fished the marine waters along the way as they travelled. It is likely that one of the reasons for travel was to harvest fish. The Suquamish travelled to Whidbey Island to fish and undoubtedly used other marine areas as well.

Report, p. 16. Dr. Lane also mentioned seasonal camps for smoke-curing fish on Bainbridge Island. *Id.*

The Report then listed thĕ following places where the Suquamish traditionally took fish (salmon, herring, steelhead, hali-

but, and shellfish), by trolling. spearing, nets, or traps: Apple Cove Point, Hood Canal, Dye's Inlet, Liberty Bay, the head of Sinclair Inlet, Skunk Bay, Union River and Curley Creek, Blake Island, Jefferson Head, Point to Point, Rich's Passage, Orchard Point, Indianola, Ross Point, Miller's Bay, Agate Passage, and the area between Chico and Erland's Point. Report, p. 19–20. This list was accompanied in the Report by a map indicating the above-named fishing places, described as being within Suquamish territory. Report, p. 20. 22. In her testimony, Dr. Lane clarified that the places marked on this map, all on the western side of Puget Sound, were sites within Suquamish territory, and did not indicate other areas where they may have traveled to fish. Transcript, p. 57.

At the April 9, 1975 hearing, Dr. Lane was questioned at length about the travels of the Suquamish. She affirmatively stated that they did travel through the San Juan Islands to the Fraser River. Transcript, p. 49. When questioned specifically about fishing in the area of the San Juan Islands, Birch Bay, and up to the Fraser River, she stated that she could not specifically cite to any documentation regarding Suquamish fishing for herring there, but that

> it's entirely likely that they fished for whatever was available as they were traveling through those waters and that they visited those waters regularly as a usual and accustomed matter in order to fish and to do other things.

Transcript, p. 52.

Upon Dr. Lane's re-cross examination, the. discussion turned to a map that accompanied the Suquamish April 3, 1975 proposed fishing regulations. A copy of this map appears as an attachment to the Declaration of James Janetta, Dkt. # 146, p. 74. The map divides greater Puget Sound into numbered areas, clearly separated by

lines drawn on the map. Area 1 includes the San Juan Islands, south about halfway down Whidbey Island, and the Strait of Juan de Fuca. Area 2 lies entirely above the San Juan Islands, extending to the Canadian border. Area 3 encompasses Samish Bay and Bellingham Bay. Area 4 includes the very south-eastern end of the Strait of Juan de Fuca, plus Admiralty Inlet, lower Puget Sound, Saratoga Passage, and Skagit Bay. *Id.* Referring to this map, attorney Paul Solomon for the Department of Game questioned Dr. Lane. The following colloquy occurred:

Q. And looking at their map attached, here, what has been described as Area Number 2, is this the area, roughly speaking, that Mr. Stay has asked you about, the Strait of Juan de Fuca, Haro Strait, and whatnot?

A. I think he has asked me about what is labeled 1 and 2 on that map.

Q. Both areas 1 and 2. That's what your comments pertain to?

A. Well, I am speaking about the San Juan Island area, what is marked Number 1 there, and then 2.

. . . .

Q. Now, your report on the Suquamish notes that they traveled from their regular area up north as far as the Fraser River, which would cover areas 1 and 2 on this.

A. Part of the Area 1

Q. Part of Area 1, and 2.

Transcript, pp. 56–57.

Nowhere in this discussion, or in Dr. Lane's entire testimony, was the area designated as Area 4 on the map mentioned. Nor were Skagit Bay and Saratoga Passage ever mentioned in Dr. Lane's testimony regarding the Suquamish travels and fishing, or in her Report. While she did testify that the Suquamish traveled up to the Fraser River, her reference to the Strait of Juan de Fuca, Haro and Rosario Strait places their route on the west side of Whidbey Island, from the Port Madison area and up through the San Juan Islands. Her one statement in her report that the Suquamish traveled "to" Whidbey Island is insufficient to support a finding that they fished or traveled in the waters on the eastern side of Whidbey Island.

This absence of evidence regarding Squamish fishing or travel through Saratoga Passage and Skagit Bay leads the Court to conclude that the Upper Skagit and Swinomish have met their burden of demonstrating that Judge Boldt did not intend to include these areas in the Suquamish U & A. The Suquamish must now point to some evidence in the record that demonstrates that this conclusion is incorrect.

In support of their assertion that their U & A includes waters on the east side of Whidbey Island, the Suquamish point to Dr. Lane's finding that the treaty-time Suquamish were competent mariners who traveled widely. They assert that those travels would necessarily have included waters east of Whidbey Island. However, as noted above, Dr. Lane testified that it was "normal" for "all the Indians in Western Washington to travel extensively ..." Transcript, p. 48. Thus such travel was not unique to the Suquamish, and no conclusion with respect to the subproceeding area can be drawn from the mere statement that they traveled widely. Dr. Lane's actual testimony, as shown above, addressed only travel from the Suquamish territory up across the Strait of Juan de Fuca and through Haro and Rosario Straits, and the San Juan Islands. It would be pure speculation to conclude that those travels must also have included the east side of Whidbey Island, as there is absolutely no evidence in the record that they did so.

Next, the Suquamish point to the fact that they were found to fish at the mouth of the Snohomish River, which is on the eastern side of Whidbey Island, but well south of the area at issue. They assert that this fishing on the east side of Whidbey Island means that they could have well headed north into Saratoga Passage in their travels. However, Suquamish fishing in this area was described by Dr. Lane as fall and winter fishing at the mouth of a river, presumably to take the abundant migrating salmon. This fall and winter fishery was described by Dr. Lane as separate and distinct from the spring and summer travels up to the Fraser River. Thus, this reference to fishing at the mouth of the Snohomish River in the fall and winter cannot be deemed evidence that the Suquamish also traveled through that area on their way north to the Fraser River in the spring and summer. There was no mention in Dr. Lane's Report of Suquamish fishing anywhere north of the Snohomish River in their fall and winter fishery.

Finally, the Suquamish point to the close relations between their people and the Skagit and Snohomish people, who had fishing camps on Whidbey and Camano Islands. They ask that the Court assume that the close relations between the tribes meant that the Suquamish must necessarily have camped and fished there as well. However, any connection between the Snohomish and Skagit camps on Whidbey and Camano Islands, and the Suquamish fishing in these areas, would again be purely speculative. There is nothing in Dr. Lane's report that places Suquamish camps in these areas, or documents Suquamish fishing there.

Judge Boldt found Dr. Lane's testimony to be authoritative and reliable in the original *U.S. v. Washington*, 384 F.Supp. at 350. His description of the Suquamish U &

A tracks nearly verbatim the language in Dr. Lane's report, that the Suquamish had the "capability to travel widely over the marine waters in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits." Report, p. 16. Further, she reported, they "regularly travelled [sic] through the San Juan Islands and to the Fraser River." *Id.* In naming these specific areas in describing the Suquamish U & A, Judge Boldt demonstrated his intent to conform the Suquamish U & A to those areas documented by Dr. Lane. As noted by the Ninth Circuit Court of Appeals, where Judge Boldt has cited the specific, rather than the general, evidence presented by Dr. Lane, that evidence determines the boundaries of a tribe's U & A. *U.S. v. Lummi Indian Tribe*, 235 F.3d at 451.

For these reasons, the Court concludes that Judge Boldt did not intend to include Saratoga Passage or Skagit Bay within the U & A of the Suquamish. Indeed, it appears from the record that this is how the Suquamish themselves interpreted their U & A. The Suquamish understanding, in 1975, that their U & A excluded waters on the eastern side of Whidbey Island is indicated in the fishing regulations they issued following the Court's ruling on their U & A. These regulations appear in the record in the Declaration of David Hawkins, Dkt. # 144, Exhibit C. These regulations set guidelines for fishing in specified marine and freshwater fishing areas. No fishing was proposed in marine area 5, on the eastern side of Whidbey Island, which at that time included the areas at issue in this subproceeding. *Id.* While the Suquamish correctly argue that it would be improper to use these fishing regulations as evidence of Judge Boldt's intent, it is not improper to use them as evidence of the Suquamish Tribe's understanding of their own U & A at that time.

## CONCLUSION

The Court has reviewed the evidence that was before Judge Boldt in the April 1975 proceeding that led to the determination of the Suquamish U & A. That evidence, including maps, fisheries reports, anthropological reports, and testimony, demonstrates that the Court and the parties had a common understanding that the term "Puget Sound" generally described a continuous body of saltwater in western Washington, including all the bays and inlets, and specifically including Skagit Bay and Saratoga Passage. On some occasions, areas such as the Strait of Juan de Fuca and Hood Canal were described separately. On other occasions, Puget Sound was treated as divided into regions, namely Southern, Central, and Northern Puget Sound. Regardless of these differences, the term "Puget Sound" as used generally by Judge Boldt included Saratoga Passage and Skagit Bay.

However, in describing the individual tribes' usual and accustomed fishing areas, Judge Boldt was necessarily indicating only a portion of that broader Puget Sound, even when, as here, he used the term "Puget Sound" without qualification. Thus, for example, in the description of the U & A of the Muckleshoot Tribe, the Court has found that the term "saltwater of Puget Sound" refers only to that portion of Puget Sound in Elliott Bay. *See, Muckleshoot III*, 235 F.3d at 438. Similarly, it has been judicially determined that the Lummi U & A, described in part as "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle" does not include the Strait of Juan de Fuca or Hood Canal. *U.S. v. Lummi*, 235 F.3d at 451–52.

Here, the Court finds that in describing the Suquamish U & A as the marine waters of Puget Sound from Vashon Island up to the Fraser River, Judge Boldt could not have intended to include Saratoga Passage or Skagit Bay. Judge Boldt relied heavily on the report and testimony of Dr. Barbara Lane, and indeed in describing the Suquamish U & A he used terms and place names taken directly from her report on the Suquamish fishing and travels. Dr. Lane reported and testified that the Suquamish traveled by canoe from their territory (Port Madison) up through the San Juan Islands, and Haro and Rosario Straits, as far as the Fraser River. Nothing in her testimony or her report indicated a Suquamish presence in Saratoga Passage or Skagit Bay, neither as winter fishing grounds, nor as a route for travel up to the San Juan Islands.

The Court thus finds that there are no factual issues in dispute, and that the requesting parties are entitled to judgment as a matter of law on their claim that the Suquamish U & A does not include Saratoga Passage or Skagit Bay. Accordingly, the motions for summary judgment by the Upper Skagit and Swinomish are GRANTED, and the Suquamish motion for summary judgment is DENIED. As no issues remain to be determined, the trial date of February 26 is now STRICKEN.

## ORDER ON MOTION FOR RECONSIDERATION

### Subproceeding No. 05–2

### (January 17, 2007)

This matter is before the Court for a ruling on a motion for reconsideration of the Court's November 21, 2006 Order on Motion to Dismiss, filed by the Makah, Quinault, Puyallup, Quileute, Lummi, Suquamish, Upper Skagit, Nisqually and Squaxin Island Tribes, and the Swinomish Indian Tribal Community ("Moving Parties"). Dkt. # 98. The Moving Parties seek reconsideration only of that portion of the Court's Order holding that it does not

have jurisdiction to resolve an inter-tribal dispute over the allocation of fisheries resources. The Court deems it unnecessary to direct that a response to the motion be filed and, for the reasons set forth below, shall deny the motion.

## DISCUSSION

This matter was initiated as a Cross-Request for Determination filed by the Skokomish Indian Tribe ("Skokomish") in Subproceeding 05–01, asking that the Court "determine and declare an equitable treaty fishing harvest allocation for the available harvest of all species of finfish and shellfish in Hood Canal." Dkt. # 55. This Cross–Request was bifurcated from Subproceeding 05–01 and opened as a separate Subproceeding. The Port Gamble and Jamestown S'Klallam Tribes ("S'Klallam") then moved to dismiss on the basis of lack of subject matter jurisdiction, res judicata and standing. The Court found reason to dismiss on both jurisdictional and res judicata grounds, and did not reach the standing argument.

■ It is the jurisdictional determination which the Moving Parties now challenge. They assert that the Court's retention of jurisdiction over "[d]isputes concerning the subject matter of this case which the parties have been unable to resolve among themselves" encompasses allocation disputes, and that this Court has specifically so held in the past. The Moving Parties have provided copies of eleven documents, plus citations to specific language in *U.S. v. Washington*, 626 F.Supp. 1405 (W.D.Wash.1985), in support of their contention. However, when these documents are considered in context and together with other rulings in this case, they provide no basis for reconsideration.

As noted in the previous Order, the Court retained jurisdiction in this matter for certain specified purposes, set forth in Paragraph 25 of the Permanent Injunction. *U.S. v. Washington*, 384 F.Supp. 312, 419 (W.D.Wash.1974), as amended by Court Order dated August 23, 1993. The relevant section of Paragraph 25 states,

> (a) The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:
>
> . . . .
>
> (4) Disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves[.]

C70–9213, Dkt. # 13599.

In moving to dismiss, the S'Klallam asserted that section (4) of Paragraph 25 is inapplicable to confer jurisdiction because the parties have settled their dispute, with finality, through the Hood Canal Agreement. In considering this argument, the Court exercised its inherent power to determine subject matter jurisdiction, and found that it did not have jurisdiction to consider the inter-tribal allocation dispute presented here, because such dispute did not concern the subject matter of this case. That subject matter, as stated clearly in the original decision in this case, is treaty-secured fishing rights:

> This case is limited to the claimed treaty-secured off-reservation fishing rights of the Plaintiff tribes as they apply to areas of the Western District of Washington within the watershed of Puget Sound and the Olympic Peninsula north of Grays Harbor, and in the adjacent offshore waters which are within the jurisdiction of the State of Washington. The subject matter of this case is limited to the application of those rights to the anadromous fish which are in the waters described, including such fish as are native to other areas.

*U.S. v. Washington*, 384 F.Supp. 312, 400 (W.D.Wash.1974). While the pool of spe-

cies covered by this case has been expanded to include non-anadromous fish and shellfish, the subject matter remains limited to the application of treaty rights to the fish. Thus, one statement to which the Moving Parties point, that "this Court has jurisdiction over the subject matter of the dispute, the fish", does not correctly state the subject matter of the case. Subject matter was defined in the first part of the same sentence: "This case is about enforcement of each of the tribes' treaty fishing rights adjudicated in this case . . ." *U.S. v. Washington,* 626 F.Supp. at 1470. While those treaty rights secured to the tribes the right to fish at their usual and accustomed places, they did not create the equitable right of any one tribe to harvest a certain portion of the treaty share.

Thus, a dispute over the exercise of a tribe's primary right, or concerning its usual and accustomed fishing area, would fall under the Court's jurisdiction, because it arises from a treaty right. But nowhere have the Moving Parties pointed to treaty language which confers upon any tribe, vis-a-vis another tribe, the right to an allocation of a portion of the treaty share of fish.

The Moving Parties contend that in its prior rulings in this case, "the Court has expressly held that it has subject matter jurisdiction over inter-tribal allocation disputes, and it has repeatedly exercised jurisdiction over such disputes." Motion for Reconsideration, p. 2–3. In reviewing the cited Orders, the Court finds that they do not support the Moving Parties' assertion with respect to jurisdiction over allocation disputes.

In 1983, in a subproceeding addressing the ocean troll fishery, the Court found that it had jurisdiction to determine whether one tribe's actions infringed the adjudicated treaty rights of other tribes, *U.S. v. Washington,* 626 F.Supp. at 1470–71. The Court noted that a prior ruling that "the question of intertribal allocation is a matter for the tribes rather than the state to resolve" did not limit the Court's jurisdiction over matters affecting treaty fishing. *Id.* The Court did not specifically rule that it could adjudicate an allocation dispute, apart from matters related to treaty rights. Nor did the Court in any way allocate the fishering among the tribes. Instead, the Court directed the disputing tribes to "confer and negotiate their differences with respect to sharing of treaty runs." *Id.* at 1471.

The Moving Parties have also cited to Subproceeding 86–5. There, the tribes designated as South Puget Sound tribes alleged that salmon originating in their streams were being intercepted upon return by tribes fishing further north, so that there were few or no salmon left to reach South Sound waters and streams. The tribes had previously negotiated among themselves an allocation of the migrating salmon, as exemplified by the 1980 South Puget Sound Region of Origin Treaty Salmon Allocation Agreement. Subproceeding 86–5, Dkt. # 173. Then, in 1986, the South Puget Sound tribes requested an injunction to protect South–Sound coho salmon stocks from interception. Dkt. # 98, Exhibit 1. Although the Orders provided by the Moving Parties do not specifically address subject matter jurisdiction, the Court notes that jurisdiction over this issue would be appropriate because it directly concerned treaty rights of the South Puget Sound tribes, rather than an allocation as such. That is, the South Sound tribes sought to enforce their right to take salmon at their usual and accustomed fishing places, as provided in the relevant treaties. If the entire tribal share of salmon were intercepted by tribes fishing farther north, the treaty rights of the South Sound tribes to take fish in their usual and

accustomed areas would be infringed. Jurisdiction was therefore appropriate to protect treaty fishing rights. Further, it appears from the various Orders filed that the interested tribes all consented to have the Court resolve the matter.

Consent to adjudication of the matter was also a factor in subproceeding 91–1, which has also been cited by the Moving Parties. In the 2001 Order Establishing Interim Halibut Fishery Management Plan", the Court stated,

> The court has retained jurisdiction to consider tribal treaty fishing issues in proceedings ancilliary [sic] to Judge Boldt's landmark decision in *United States v. Washington,* C70–9213, and the instant parties have consented to the authority of this court to enter an order adopting an FMP for the 2001 halibut fishery.

Subproceeding 91–1, Dkt. # 75, p. 5. This was another case in which treaty-based fishing rights were at issue: the moving tribes alleged that unrestricted halibut fishing in the ocean by certain tribes would quickly exhaust the entire tribal quota, leaving few or no halibut for the other tribes. *See,* Report and Recommendation on Halibut Allocation, Subproceeding 91–1, Dkt. # 2240, p. 2. Again, jurisdiction was proper in order to protect certain tribes' treaty rights to fish for halibut.

Finally, the Moving Parties point to subproceeding 96–1, regarding the black cod fishery. In that subproceeding, three petitioning tribes alleged that fishing by the Quileute tribe with pot gear would completely preempt their long-line fishery, or force them to use pot gear themselves. In granting a motion for a preliminary injunction, the Court specifically noted that the Quileute Tribe had agreed with the petitioning tribes' request for an equitable allocation. Subproceeding 96–1, Dkt. # 47, p. 3. It was this consent that provided a

basis for the Court's jurisdiction to determine an allocation.

Pursuant to Paragraph 25 of the permanent injunction in this case, jurisdiction has been retained for certain limited purposes, as set forth in that paragraph. The parties to this case, whether tribal, state, or federal, have waived sovereign immunity for those purposes only. In consideration of the importance of sovereign immunity, such purposes may not be broadened without the parties' consent.

In 1993, in objecting to a proposed "Sunset Order" which would close this case, the tribes invoked sovereign. immunity as a basis for asking that the Court keep this case open until "all the disputes between these parties regarding treaty fishing rights have been resolved." Dkt. # 98, Exhibit 9, p. 7. While the tribes speculated that such adjudicable disputes could include resolution of intertribal allocation issues, there was no such specific finding by the Court. *Id.* It is this Court's view that equitable allocation is a management issue, and does not arise from the tribes' treaty rights. The tribes in their objection to the Sunset Order, including every tribe now before the Court as a Moving Party, assured the Court that concern over Court involvement in fisheries regulation was without basis, because "most of the underlying disputes are not with management per se but with essential legal issues which need determination by a court of law." *Id.,* p. 5.

A simple request for equitable allocation, in the absence of factors by which one or more tribes may completely preempt another tribe's right to fish, does not present a legal issue for determination by this Court. The Court thus declines to reconsider its ruling that it does not have jurisdiction under Paragraph 25 to consider such request, in the absence of consent by

all parties. The motion for reconsideration is accordingly DENIED.

## STIPULATION OF PLAINTIFFS AND STATE OF WASHINGTON REGARDING SCOPE OF SUB–PROCEEDING, AND ORDER

Subproceeding No. 01–1 (Culverts)

(January 29, 2007)

In order to resolve potential disagreement concerning the scope of the claims in this sub-proceeding and the relief, if any, that may be appropriate to resolve those claims, and thereby to promote the objectives of Federal Rules of Civil Procedure 1, 8, and 16, Plaintiffs and the State of Washington stipulate as follows, and move for entry of a corresponding order:

1. The scope of this sub-proceeding only includes those culverts that block fish passage under State-owned roads. Culverts that do not block fish lie beyond the scope of this case, even though they may adversely affect river or stream ecological functions. Tidegates are also beyond the scope of this sub-proceeding.

2. In any remedy stage of this sub-proceeding, the Plaintiffs are not limited in arguing and the Court is not limited in granting relief that requires that culverts identified as adversely affecting fish passage be repaired to remove any impediments to both fish passage and to ecological functions. This Stipulation does not reduce or enlarge the equitable powers of the Court to formulate a remedy consistent with the orders entered in this case and the application of applicable law.

3. In any remedy stage of this sub-proceeding, the parties reserve the right to argue whether the culvert inventories were adequate to identify the culverts that do not pass fish, and whether further inventories should be ordered to identify such culverts. Culverts that exist on the date that the Court enters a final order in this sub-proceeding and that affect ecological functions but are not fish passage barriers need not be inventoried, repaired, or replaced as part of any relief ordered in this sub-proceeding.

4. The Plaintiffs are not limited as a result of this sub-proceeding from seeking relief against the State in another sub-proceeding or case, to repair or replace State-owned tidegates or culverts that do not block fish but adversely affect river or stream ecological functions. The Plaintiffs may seek relief against the State to repair or replace State-owned tidegates and culverts that may be identified in the future as adversely affecting fish passage or ecological functions, but which are not identified as fish passage barriers in any inventory of barriers prepared prior to or pursuant to entry of a final order in this sub-proceeding.

## ORDER

## JOINT MOTION FOR ORDER AND CONSENT DECREE APPROVING SETTLEMENT AGREEMENT

Note On Motion Calendar: June 20, 2007

Subproceeding No. 89–3(Shellfish)

The Parties identified below seek this Court's entry of an Order that approves the Parties' Settlement Agreement attached hereto as Exhibit A. The Parties to the Settlement Agreement are as follows:

Plaintiff Indian Tribes: Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown S'Klallam, Suquamish and Swinomish ("Tribes");

Plaintiff United States of America;

Defendant State of Washington; and

Intervenor–Defendant Puget Sound Shellfish Growers: Taylor United, Inc.; Olympia Oyster Company; G.R. Clam & Oyster Farm; Cedric E. Lindsay; Minterbrook Oyster Company; Charles and Willa Murray; Skookum Bay Oyster Company; and J & G Gunstone Clams, Inc. ("Growers").

The undersigned representatives of the Parties affirm and agree that the Settlement Agreement is fair and reasonable and, by the signatures of their representatives below, the Parties consent to and are fully bound by all its terms. The undersigned further affirm and agree that the contingencies identified in ¶ 9.A.1, ¶ 9.A.2, and II 9.A.4 of the Settlement Agreement have been fully and completely satisfied, as evidenced by the attached Exhibits B through D.

Each undersigned representative of the Parties to this Consent Decree certifies that he or she is fully authorized by that Party to enter into and execute the terms and conditions of this Joint Motion for Approval of Settlement Agreement, and to legally bind such Party to the Order and the Settlement Agreement. By their representatives' signatures below, the Parties consent to the entry of the Order Approving the Settlement Agreement.

## EXHIBIT A

## SETTLEMENT AGREEMENT

### THE HONORABLE RICARDO S. MARTINEZ

### UNITED STATES DISTRICT COURT

### WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs

v.

STATE OF WASHINGTON, et al., Defendants

Case No.: C70–9213

Subproceeding No. 89–3 (Shellfish)

SETTLEMENT AGREEMENT

The Tribes listed in section 1 ("Tribes"), the Puget Sound Shellfish Growers ("Growers"), the United States Department of the Interior, and the State of Washington, by and through the undersigned representatives, hereby enter into this Settlement Agreement.

**WHEREAS** the Tribes have asserted treaty right claims to take shellfish from lands owned, leased, or otherwise subject to harvest by the Growers, which claims have resulted in the following decisions:

1. *United States v. Washington*, 873 F.Supp. 1422 (W.D.Wash.1994).

2. *United States v. Washington*, 898 F.Supp. 1453 (W.D.Wash.1995) (as modified by the Stipulation and Order Amending Shellfish Implementation Plan, dated April 8, 2002) (hereinafter the "Revised Shellfish Implementation Plan").

3. *United States v. Washington*, 909 F.Supp. 787 (W.D.Wash.1995).

4. *United States v. Washington*, 157 F.3d 630 (9th Cir.1998);

**WHEREAS** the parties to this Settlement Agreement acknowledge that the district court found that the Growers are "innocent purchasers who had no notice of the Tribes' fishing right when they acquired their property." 898 F.Supp. at 1457;

**WHEREAS** the parties agree that numerous unresolved issues remain outstanding regarding implementation of the Tribes' treaty right to take shellfish from lands owned, leased or otherwise subject to harvest by the Growers; and

WHEREAS the Tribes, Growers, the United States Department of the Interior, and the State of Washington are interested in resolving any and all disputes between and among them regarding implementation of the Tribes' treaty right to take shellfish from lands owned or leased by the Growers, they agree as follows.

## SETTLEMENT AGREEMENT

### 1. TRIBES.

The Tribes bound by this Settlement Agreement are the Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown S'Klallam, Suquamish, and the Swinomish Tribes (hereinafter "Tribes"). The Tribes are parties to the following treaties: Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132); Treaty of Point Elliott, January 26, 1855 (12 Stat. 927); Treaty of Point No Point, January 26, 1855 (12 Stat. 933); Treaty with the Makah, January 31, 1855 (12 Stat. 939) (hereafter "the treaties").

### 2. INTERVENOR DEFENDANTS.

A. The intervenor defendants bound by this Settlement Agreement shall include the following: Taylor United, Inc.; Olympia Oyster Company; G.R. Clam & Oyster Farm; Cedric E. Lindsay; Minterbrook Oyster Company; Charles and Willa Murray; Skookum Bay Oyster Company; and J & G Gunstone Clams, Inc. These growers need only file with the Court and serve on Plaintiff Tribes by March 1, 2008 a sufficiently identified list of their tidelands, for example, by county and county tax parcel, owned, leased from a private party or otherwise subject to a right to harvest by these growers as of August 28, 1995.

B. In addition, all persons who are members of the Puget Sound Shellfish Growers Legal Defense Fund, Inc., and who on or before August 28, 1995, owned, leased from a private party, or otherwise had a right to commercial harvests of shellfish from tidelands in Washington State, and either:

(i) on or before August 28, 1995, had an active aquatic farm registration for commercial shellfishing from those tidelands and a Washington Department of Health certification for those tidelands, *provided*, that they intervene and file with the Court and serve on Plaintiff Tribes by March 1, 2008, copies of the documents that establish their compliance with this subsection and a sufficiently identified list of those tidelands, for example, by county and county tax parcel; or

(ii) on or before the date the person seeks to intervene had an active aquatic farm registration for commercial shellfishing and a Washington Department of Health certification for those tidelands, *provided*, that such persons intervene and file with the Court and serve on the Plaintiff Tribes by March 1, 2008, copies of documents that establish their compliance with this subsection and a sufficiently identified list of those tidelands, for example, by county and county tax parcel, and, further, file documentary evidence establishing that those tidelands were used for sustained commercial production of shellfish during some portion of the time between January 1, 1985, and August 28, 1995;

shall be covered by the terms of this Settlement Agreement.

C. In addition, a person who between August 28, 1995 and March 1, 2008 acquires the right to harvest from a person whose tidelands are covered under section 2(A) and section 5 or from a person whose tidelands would have been eligible to become covered tidelands under section

2(B)(i) or (ii) and section 5, so long as the eligibility for including the tidelands under section 2(B)(i) or (ii) is documented as provided in those subsections, and on or before the date the person seeks to intervene had an active aquatic farm registration for commercial shellfishing and a Washington Department of Health certification for those tidelands, *provided,* that such persons intervene and file with the Court and serve on the Plaintiff Tribes by March 1,2008, copies of documents that establish their compliance with this subsection, shall be covered by the terms of this Settlement Agreement.

D. Any person holding a commercial shellfish lease for state tidelands identified in section 4(A) shall be covered by the terms of this Settlement Agreement.

E. A person who at any time acquires the right to harvest from tidelands covered pursuant to section 5, from a person who actually intervened pursuant to section 2(A), 2(B), 2(C), 2(D), or this subsection, may become bound by the terms of this Settlement Agreement by filing with the Court a request to intervene in this proceeding for that limited purpose, supported by a copy of their aquatic farm registration for commercial shellfishing filed with the Washington Department of Fisheries and Wildlife, their Washington Department of Health certification for those tidelands, and their deed, lease or contract showing the locations of the tidelands on which they have acquired the right to harvest.

F. All persons who fulfill the conditions of section 2(8), 2(C), 2(D) or 2(E) may intervene as defendants for the limited purpose only of participation in this Settlement Agreement. Any person who fails to actually intervene, except to the extent that a person is covered pursuant to section 2(D), shall have no rights under this Settlement Agreement.

G. Participation in this Settlement Agreement is a result of settlement and compromise and establishes only those persons who are covered by this Settlement Agreement. Such participation does not represent an admission or agreement by any party that a participant could or could not qualify as a commercial shellfish grower within the terms of the Revised Shellfish Implementation Plan. Therefore no person may refer to or rely upon this Settlement Agreement, nor any person's participation in the Settlement Agreement, and the Court shall not consider any such evidence, in any dispute as to the requirements necessary for any person to qualify as a commercial shellfish grower for purposes of the Revised Shellfish Implementation Plan.

H. A person who files a list of tidelands called for in section 2(A), 2(B), 2(C) or 2(E) and discovers that the list was incomplete through inadvertence or oversight may amend the list to include those tidelands.

3. **STATE OF WASHINGTON AND UNITED STATES.**

Except as set forth in section 12, the State of Washington acknowledges and appreciates the efforts of the Tribes and Growers to resolve the existing disputes and supports this Settlement Agreement. Except as set forth in section 12, the United States supports the efforts of the Tribes and Growers to resolve any and all existing disputes between and among them through this Settlement Agreement.

4. **STATE–OWNED TIDELANDS COVERED BY RELEASE.**

A. Subject to subsections 4(B), (C), (D), and (E) and Section 9, below, the tidelands covered by the following State of Washington Department of Natural Resources (hereinafter "DNR") agreements

shall be considered "covered tidelands" for the purposes of Section 6 of this Settle- ment Agreement when leased for any shellfish cultivation purpose:

| LEASE # | COMPANY | USE | START | END | WATERBODY | SEC | TWN | RANGE |
|---|---|---|---|---|---|---|---|---|
| 20009733 | LITTLE SKOOKUM SHELLFISH | CLAM | 28-Jun-93 | 30-Jun-03 | PS SKOOKUM | 10 | 19 | 03 W |
| | | OYSTERS | | | | | | |
| 20009719 | TAYLOR UNITED | CLAM | 28-Jun-93 | 30-Jun-03 | PS SKOOKUM | 10 | 19 | 03 W |
| | | OYSTERS | | | | | | |
| 20009703 | LITTLE SKOOKUM SHELLFISH | CLAM | 28-Jun-93 | 30-Jun-03 | PS SKOOKUM | 10 | 19 | 03 W |
| 20A09206 | JEFFREY DELIA | OYSTERS | 30-Sep-99 | 29-Sep-09 | HC DABOB | 21 | 27 | 01 W |
| 20A09307 | E YAMASHITA | OYSTERS | 2-Dec-99 | 1-Dec-09 | HC DABOB | 28 | 26 | 01 W |
| 20012043 | ROGER C LINDEMAN | CLAM | 5-Mar-94 | 4-Mar-04 | PS SEQUIM | 36 | 30 | 03 W |
| 20A12047 | JODI CLAM COMPANY | CLAM | 17-Sep-96 | 1-Nov-08 | PS SEQUIM | 36 | 30 | 03 W |
| 20A12695 | WALLY PEDERSON | OYSTERS | 1-May-99 | 30-Apr-09 | HC DABOB | 27 | 27 | 01 W |
| 20A12355 | TAYLOR RESOURCES | OYSTERS CLAM | 19-Jun-96 | 18-Jun-08 | HC DOSEWALLIPS | | | 02 W |
| 20-A09868 | C W GUNSTONE | CLAM | 3-Mar-90 | 3-Mar-00 | ST DISCOVERY | 36 | 30 | 03 W |
| 20-A11121 | E YAMASHITA | OYSTERS | 1-Aug-89 | 31-Jul-99 | HC DABOB | 16 | 27 | 01 W |
| 20-A10234 | ****CRESENT BEACH OYSTER AND CLAM | OYSTERS | 11-Apr-84 | 11-Apr-92 | PS SHIP | 13 | 37 | 02 W |
| 20010050 | J J BRENNER OYSTER CO | CLAM | 22-Dec-90 | 22-Dec-00 | PS SKOOKUM | 9 | 19 | 03 W |
| 22002530 | E T & M E HAEFLIGER | CLAM | 1-Sep-80 | 1-Sep-95 | PS OAKLAND | 16 | 20 | 03 W |
| 20A12800 | GUNSTONE CLAMS | CLAM | 31-Oct-88 | 1-Nov-98 | PS SEQUIM | 23 | 30 | 03 W |
| 20009956 | GARY & JANICE MAZZONCINI | CLAM | 7-Jul-90 | 1-Jul-00 | HC HAMMA HAMMA | | | 03 W |
| | | OYSTERS | | | | | | |
| 20011283 | JERRY YAMASHITA | OYSTERS | 5-May-91 | 1-May-01 | HC DABOB | 15 & 16 | 27 | 01 W |
| 20013012 | JAMESTOWN KLALLAM TRIBE | OYSTERS | 1-Aug-90 | 1-Aug-00 | PS DUNGENESS | 23 | 31 | 04 W |
| 20012571 | JAMESTOWN KLALLAM TRIBE | OYSTERS | 1-Jun-87 | 1-Jun-97 | PS SEQUIM | 12 | 29 | 03 W |
| 20012924 | JAMESTOWN KLALLAM TRIBE | OYSTERS | 1-Jan-90 | 1-Jan-00 | PS SEQUIM | 1 & 12 | 29 | 03 W |
| 20012228 | CHARLES & MARIE BRODERS | CLAM | 1-Aug-85 | 1-Aug-96 | ST DISCOVERY | 7 & 18 | 29 | 01 W |
| 20011665 | TAYLOR UNITED | OYSTERS | 1-Jul-81 | 1-Jul-93 | HOOD CANAL | 31 | 22 | 03 W |

**** Crescent Beach Oyster and Clam app rejected, new app pending

B. For a lease of covered tidelands identified in subsection 4(A) that has ex- pired before the date the Court signs a Consent Decree which implements the terms of this Settlement Agreement, DNR shall have up to eighteen months from the date of the Court's signature to execute a renewal of the lease with the prior lessee, or, where the prior lessee is deceased, the prior lessee's interest is now held by a member of the immediate family, or where the prior lessee was a business and the name of the business changed without a change in ownership, with that lessee's successor in interest. DNR agrees to ex-

pedite its efforts to obtain a lease renewal and to notify the tribes as soon as a lease renewal has been signed or a determination has been made that no renewal will take place. As soon as DNR determines that no renewal can or will take place with the prior lessee (or its immediate successor in interest as provided above), and notifies the tribe of that fact; or eighteen months after the Court signs a Consent Decree which implements the terms of this Settlement Agreement without a new lease being signed, whichever is sooner, the tribes shall have up to ninety days to elect to either exercise their treaty shellfishing rights using the principles of section 4 of the Revised Shellfish Implementation Plan, or negotiate a lease for those covered tidelands.

(i) If tribes elect to exercise treaty shellfishing rights on the subject property DNR may attempt to lease the subject covered tidelands for up to three years from the date the tribes make the election. Any new lease must be issued at a fair market rental rate that is comparable to other commercial shellfish leases for the type of property and shellfish cultivation operation being considered. If DNR enters into a new lease within the three-year period, tribal shellfish harvesting pursuant to this subsection will cease as of the date that lease is executed. If no new lease has been signed within the three year period the subject property will cease to be considered covered tidelands and Will be fully subject to the Revised Shellfish Implementation Plan. Tribal exercise of shellfishing rights during the three year period for State leasing efforts shall be undertaken in a manner that does not interfere with or impair DNR's ability to issue a new lease. As part of exercising their Treaty shellfish harvesting right pursuant to this subsection, the Tribes

will conduct a shellfish population survey and provide a copy to DNR.

(ii) (a) If tribes elect to negotiate a lease for the covered tidelands, DNR and the tribes will negotiate a lease on terms that are comparable to other commercial shellfish leases for the type of property and shellfish cultivation operation being considered. If no property boundary survey is required, DNR and the tribes will have six months from the date the tribes make their election pursuant to subsection 4(B) to execute a lease. If a property boundary survey is required, DNR and the tribes will have nine months from the date the tribes make their election pursuant to subsection 4(B) to execute a lease. During such lease negotiations, the tribes may exercise their treaty shellfishing rights on the subject property as provided in subsection 4(B)(i), provided however, the tribes pay DNR a mutually agreed-upon rate for any shellfish taken during such negotiation period.

(ii) (b) If the tribes reject the lease terms offered by DNR or the lease is not executed within the time periods identified in the preceding subsection, DNR may attempt (during the remainder of the three year period that began with the tribes' election pursuant to subsection 4(B)) to lease the subject tidelands to another person so long as the terms offered to such person are no more favorable to that person than the terms last offered to the tribes. During such leasing efforts the tribes may exercise their treaty shellfishing rights on the subject property as provided in subsection 4(B)(i). For the purpose of determining whether DNR has offered a lease to a third party on terms no better than were offered to the tribes, the tribes recognize that rental rates for DNR shellfish leases are based in part

on variables like the amount of shellfish on the leased parcel, the mortality rate of the shellfish and the market price of the shellfish. The tribes further recognize that a change in these kinds of variables, like a change in the amount of shellfish on that parcel due to tribal harvesting, a change in mortality rate, or a change in the market price for the shellfish, will likely change the rent offered to the lessee of that parcel. The tribes agree that any such rent changes will not be considered "terms ... more favorable to that [third] person than the terms last offered to the tribes."

C. When a lease of covered tidelands identified in subsection 4(A) is terminated before the lease expiration date DNR shall give immediate notice to the tribes. The tribes will have ninety days from the date of that notice to elect to either exercise their treaty shellfishing rights using the principles of the Revised Shellfish Implementation Plan, take over the lease for the duration of the remaining period of the lease, including all rights, if any, to renew that lease upon its expiration, or attempt to negotiate a new lease with DNR. If the tribes elect to exercise their treaty shellfishing rights the provisions of subsection 4(B)(i) shall apply. If the tribes elect to attempt to negotiate a new lease with DNR the provisions of subsection 4(B)(ii) shall apply. However, if the funding anticipated by section 7 on the schedule expressed in section 9 is not realized, then the provisions of this subsection do not apply.

D. When a lease of covered tidelands identified in subsection 4(A) expires after the date the Court signs the implementing Consent Decree without being renewed, including those leases previously renewed pursuant to subsection 4(B), DNR shall have up to six months from the date of the expiration of the lease, or nine months in the event a property boundary survey is needed, to execute a renewal of the lease with the prior lessee. DNR agrees to expedite its efforts to obtain a lease renewal and to notify the tribes as soon as a lease renewal has been signed or a determination has been made that no renewal will take place. As soon as it has been determined that no renewal will take place, or six months (or nine months where a property boundary survey was needed) after the expiration of the lease without a renewal being signed, whichever is sooner, the tribes will have ninety days to elect to either exercise their treaty shellfishing rights using the principles of the Revised Shellfish Implementation Plan, or negotiate a lease for the covered tidelands. If the tribes elect to exercise their treaty shellfishing rights the provisions of subsection 4(8)(i) shall apply. If the tribes elect to attempt to negotiate a new lease with DNR the provisions of subsection 4(B)(ii) shall apply.

E. (i) Subject to the exceptions set forth in subsection 4(E)(ii) below, when the lessee of a lease of covered tidelands identified in subsection 4(A) attempts to transfer ownership of the lease DNR will give immediate notice to the tribes. The tribes will have ninety days from the date of that notice to elect to either exercise their treaty shellfishing rights using the principles of the Revised Shellfish Implementation Plan, take over the lease for the duration of the remaining period of the lease, including all rights to renew that lease, if any, upon its expiration, or attempt to negotiate a new lease with DNR. If the tribes elect to exercise their treaty shellfishing rights the provisions of subsection 4(B)(i) shall apply. If the tribes elect to attempt to negotiate a new lease with DNR the provisions of subsection 4(B)(ii) shall apply.

(ii) However, the provisions of subsection 4(E)(i) do not apply where the transfer of the lease is to a member of the lessee's immediate family, where the transfer is only the result of a change in the form of organization holding the lease without any change in control to any new persons, or where the transfer is part of a bulk sale of all the lessee's shellfish cultivation landholdings.

F. Renewals of leases and leases of covered tidelands identified in subsection 4(A) shall be for no longer than a period of ten years.

G. These provisions of section 4 shall not be applied to eliminate or modify any pre-existing statutory or contractual rights, including the right to freely assign a lease. DNR shall include provisions in future leases that facilitate the tribes' rights to lease pursuant to this section 4 by requiring the lessee to agree that the lease will subject to the terms of this section 4.

H. DNR shall include a provision in its leases and lease renewals that are entered into after December 1, 2003 for the covered tidelands in subsection 4(A) that provides: if the funding anticipated by Section 7 on the schedule expressed in Section 9 is not realized then the leases and or lease renewals shall, for the remainder of the lease term, be subject to a request for Tribal harvest under section 6 of the Revised Shellfish Implementation Plan, notwithstanding any failure by the Tribe to give notice under section 8.2.2 of the Revised Shellfish Implementation Plan, and not withstanding the requirements of section 6.1.4 of the Revised Shellfish Implementation Plan.

5. **TIDELANDS COVERED BY RE- LEASE.**

A. Tidelands and Transfers of Control of Tidelands.

In addition to those State owned tidelands identified in section 4 of this Settlement Agreement, and in addition to the tidelands owned, leased from a private party, or otherwise subject to a right to harvest as of August 28, 1995, by the persons identified in subsection 2(A) above, the following tidelands shall be covered tidelands for the purposes of Section 6 of this Settlement Agreement:

a. those non-State owned tidelands owned, leased from a private party, or otherwise subject to a right of harvest as of August 28, 1995, by the persons who intervene in this proceeding pursuant to section 2(B), and

b. those non-State owned tidelands owned, leased from a private party, or otherwise subject to a right of harvest after August 28, 1995, where those tidelands were, before the date that a Consent Decree implementing this Settlement Agreement is entered by the Court, established not to include a natural shellfish bed pursuant to section 6.3 of the Revised Shellfish Implementation Plan.

(ii) If the right to harvest tidelands identified in subsection 5(A)(i) above are or were transferred to a person identified under subsection 2(A), 2(B), 2(C), 2(D) or 2(E) above at any time after August 28, 1995, those tidelands shall remain covered by section 6 of this Settlement Agreement.

B. Tidelands covered pursuant to subsections 5(A), above, shall cease to be covered if those tidelands are sold, deeded, or otherwise permanently transferred so that the tidelands are no longer used for the commercial cultivation of shellfish (commercial cultivation, for purposes of this subsection, includes allowing the land to lie idle when done with the intent of using

those tidelands for commercial purposes in the future).

C. Whenever covered tidelands are sold, deeded, or otherwise permanently transferred, the transferring party shall promptly provide notice of that fact, including the location of the tidelands affected and the name and address of any new owner of the affected tidelands. Notice shall be sufficient if it is sent to the Northwest Indian Fisheries Commission, 6730 Martin Way E., Olympia, WA 98516. Failure to provide such notice, however, will not affect the validity of the sale, deed or transfer, nor affect the status of the tidelands as covered for purposes of this Settlement Agreement.

## 6. RELEASE OF CLAIMS.

A. **Tribes' Treaty Claims.** Upon fulfillment of all contingencies stated in Section 9 A. below, and for the purpose only of this Settlement Agreement, the Tribes agree, on their own behalf and on behalf of their predecessors, successors, and members, that any and all shellfish on "covered tidelands" within the terms of sections 4 and 5, above, are deemed as of the date of this Settlement Agreement to be "staked or cultivated by citizens" for the purpose of implementing the Treaties referenced in section 1, above. The Tribes hereby represent that they are intimately acquainted with the Puget Sound area and with all tribes, or their successors, who are or were party to the treaties listed in section 1 and that, to the best of their knowledge, there are presently no tribes or persons, other than the signatories to this Settlement Agreement, who have a right to take shellfish under the treaties listed in section 1.

B. **Tribes' Claims Against the United States and State of Washington.** Upon fulfillment of all contingencies stated in Section 9 A. below, the Tribes, on their own behalf and on behalf of their predecessors, successors, and members, hereby waive and release forever the United States and the State of Washington from all past and present claims, known and unknown, arising from or related to actions or inactions by the United States or the State of Washington arising from or related to the Tribes' treaty rights of taking shellfish from covered tidelands set forth in section 4 and 5 above. Such claims regarding those covered tidelands include, but are not limited to, 1) claims for alleged injury to the treaty shellfishing rights resulting from human activities authorized or permitted by the United States or the State of Washington on the covered tidelands; 2) breach of trust claims against the United States for failure or delay in the protection, acquisition, enhancement or development of the shellfish resource on the covered tidelands; and 3) breach of trust claims arising from or related to the United States' actions in this sub-proceeding 89-3, including but not limited to claims related to the litigation of this sub-proceeding and negotiation, execution and approval of this Settlement Agreement, including its terms.

C. **Growers' Claims Against the United States.** Upon fulfillment of all contingencies stated in Section 9 A., below, the Growers listed in section 2, and any persons or entities that become an Intervenor Defendant under section 2 above, on their own behalf and on behalf of their predecessors, successors, and members, waive and release forever the United States from any claims arising from or related to the existence of treaty rights to harvest shellfish from any tidelands they own, lease or in which they otherwise have a legal interest. Such claims include, but are not limited to, 1) all claims arising from or related to the actions, inaction, or

alleged delay in taking action, by the United States related to the enforcement or protection of the Tribes' treaty shellfishing rights; and 2) all claims for taking of private or other property rights or interests in connection with the United States' enforcement or protection of the Tribes' treaty shellfishing rights.

**D. Grower's Claims Against the State.** Upon fulfillment of all contingencies stated in Section 9 A., below, the growers listed in section 2, and any persons or entities that become an Intervenor Defendant under section 2 above, forever waive and release the State of Washington from any claims arising from or related to the existence of treaty rights to harvest shellfish from any tidelands they own, lease, or in which they otherwise have a legal interest. For the purposes of this provision, the term "tidelands" includes all aquatic lands in which Intervenor Defendants have some interest and which were conveyed by the State of Washington or are currently owned by the State of Washington subject to some interest held by Intervenor Defendants. This waiver and release of claims against the State of Washington shall be binding upon and inure to the benefit of the parties' successors and assigns. Once effective, this waiver and release continues in force and with the same effect if covered tidelands cease to be covered tidelands at some future date.

**E. State's Claims Against the United States.** Upon the fulfillment of all contingencies stated in Section 9 A. below, the State of Washington waives and releases forever the United States from any claims arising from or relating to the existence of treaty rights to harvest shellfish from any covered tidelands set forth in Section 4 and 5 that the State owns or any covered tidelands in which the State acquires some real property interest. Such claims include, but are not limited to, all claims related to the actions, inactions, or alleged delay in taking action, by the United States related to the enforcement or protection of the Tribes' Treaty shellfishing rights on the covered tidelands.

**F. United States' Claims Against the State.** Upon the fulfillment of all contingencies stated in Section 9 A., below, and release of the tribal claims, the United States waives and releases forever the State of Washington from any claims arising from or related to the existence of treaty rights to harvest shellfish from any covered tidelands described in Sections 4 and 5 *supra* that the State owns or any covered tidelands in which the State acquires some real property interest. Such claims include, but are not limited to, all claims arising from or related to the actions, inaction, or alleged delay in taking action, by the State of Washington related to the recognition of the Tribes' treaty shellfishing rights on the covered tidelands as well as any existing claims for alleged injury to the treaty shellfishing rights resulting from human activities authorized or permitted by the State of Washington on the covered tidelands.

## 7. CONSIDERATION.

In consideration for the releases set forth above in section 6, the Tribes shall receive $33,000,000 from state or federal sources, as set forth in Section 9, below. The monies to be received by the Tribes shall be used by the Tribes for the development of their shellfisheries, including, but not limited to, the acquisition of appropriate properties. The Tribes and Growers shall make their best concerted efforts to jointly request that $33,000,000 be appropriated from federal or state sources.

## 8. PURCHASE OF GROWER PROPERTY.

In recognition of the treaty rights recognized by the courts in this action, the Growers further agree that within one year from the date that all contingencies in Section 9.A of this settlement agreement have been fulfilled, the Growers shall make available to the Tribes for purchase, at fair market value, at least 80 acres of tidelands, at least 40 acres of which shall be in Samish Bay, that are producing or are suitable for producing commercial harvests of shellfish. Fair market value for the land to be made available for sale shall be determined by an appraiser agreed upon by the selling grower and the tribe or tribes purchasing the land. If no agreement on an appraiser can be reached, each side shall appoint an appraiser. The two appraisers shall select a third appraiser. The appraiser mutually agreed by the parties, or the third appraiser, shall establish the fair market value of the land, which appraised value shall be final and binding so that the selling grower shall be bound to sell at the appraised price. The tribes may choose not to purchase the offered property at that price; in that event the Growers shall not be obligated to make any additional or different offer for the number of acres contained in the rejected offer.

The tribes may choose to purchase less than the entire acreage offered to them where the cost of the whole offering would exceed the amount the tribes have set aside for purchase of tideland properties, provided that they may not choose only the most select of scattered parcels from the overall property offered in such a way as to substantially reduce the value of the remaining parcels. If the tribes choose to purchase less than the entire amount offered, the selling grower and the purchasing tribes shall agree on the portion to be made available to the tribes. Any disagreement as to the price shall be resolved by the same appraisal procedure as set forth above. Any dispute as to the portion to be made available to the tribes shall be subject to the dispute resolution procedure set forth in section 11.

## 9. CONTINGENT AGREEMENT.

A. This Settlement Agreement is expressly conditioned and contingent on the following:

1. By June 29, 2007, enactment of legislation by the United States Congress that is signed by the President that:

(a) approves this Settlement Agreement,

(b) outlines a process for the consideration of the inclusion of other treaty tribe(s) in this Settlement Agreement without abrogation, extinguishment, or other equivalent action by Congress, the Secretary of Interior, or any other entity,

(c) authorizes the appropriation of money for the benefit of the Tribes that are parties to this Settlement Agreement, in the amounts and by the dates stated below in subsection 9.C, and

(d) authorizes the Tribes that are parties to this Settlement Agreement, either individually or collectively, to bring suit against the United States in the United States Court of Federal Claims for money damages, including interest, in the event that any payment by the United States required by subsection 9.0 is not made in the full amount, or not within six months following the date required by subsection 9.C, or not in a manner consistent with the unanimous written

agreement of the Tribes as served on all parties pursuant to subsection 9.A(4).

2. By June 29, 2007, appropriation of $11,000,000 from the State of Washington for the benefit of the Tribes that are parties to this Settlement Agreement. The parties acknowledge that the State of Washington has appropriated funds for this settlement agreement under Section 308(8) of ESSB 6386 (Laws of 2006, Chapter 372), but that the actual release and application of the appropriated monies is subject to contingencies regarding the execution and full effectiveness of this settlement and the accompanying consent decree. The contingencies set forth in ESSB 6386, Section 308(8), must be fulfilled by June 29, 2007 or the appropriation lapses and the terms of this settlement agreement will not be fulfilled and this agreement may be certified as null and void in accordance with Section 9.B.

3. By June 29, 2007, the United States District Court which is presiding over *United States v. Washington*, Civ. No. C70–9213, Subproceeding No. 89–3 (shellfish), approves this Settlement Agreement and enters a corresponding consent decree.

4. By May 15, 2007, the Tribes that are parties to this Settlement Agreement unanimously agree in writing on the payee or payees, and the allocation of payments to be made, for receipt of the funds appropriated pursuant to subsections 9.A(1) and (2), and serve such writing on the other parties to this agreement.

B. If any one of the conditions stated in subsection 9.A are not fulfilled, without regard to the reason, and without regard to the fault of any party, this Consent Decree and Settlement Agreement shall be vacated and null and void and no party shall have any rights hereunder, and any individual tribal party or any other party may request, and the Court shall so certify, that this settlement agreement has become null and void. From the date of that certification the provisions of the Revised Shellfish Implementation Plan will have full force and effect, provided, however, that the Tribes' starting one year opportunity to give notice to Growers pursuant to sections 6.1 and 6.1.4 of the Revised Shellfish Implementation Plan shall begin with the date of certification or the date Exhibit A of the Revised Shellfish Implementation Plan is completed with respect to at least manila clams, native littleneck clams, geoduck clams and pacific oysters, whichever is later. Future opportunities for tribal notice shall then occur pursuant to the terms of section 6.1.4 of the Revised Shellfish Implementation Plan.

C. Payments to the Tribes that are parties to this Settlement Agreement of the funds appropriated by the United States and State of Washington, in accordance with the written agreement served on the parties pursuant to subsection 9.A(4), shall be made as follows:

1. From the United States:

$2,000,000 by 09/03/2007, plus

$5,000,000 by 09/03/2008, plus

$5,000,000 by 09/03/2009, plus

$5,000,000 by 09/03/2010; plus

$5,000,000 by 09/03/2011; and

2. From the State of Washington, $11,000,000 will be disbursed by September 3, 2007, upon timely fulfillment of all contingencies specified in Section 308(8) of ESSB 6386. The terms and conditions of this settlement agreement shall not be vacated or certified as null and void for any deficiency in the United States failure to make the payments specified in this Section subsequent to June 29, 2006. The provisions of Sections 9.A, 9.B, and 9.0 are provided to address that circumstance.

3. If all contingencies set forth in ESSB 6386, Section 308(8), are fulfilled by June 29, 2007, but the payment required from the State of Washington by subsection 9.0 is not made in the full amount, or not by the date required by subsection 9.C, or not in a manner consistent with the unanimous written agreement of the Tribes as served on all parties pursuant to subsection 9.A(4), the State of Washington waives its immunity and consents to suit by the Tribes that are parties to this Settlement Agreement, either individually or collectively, for money damages equal to the amount of any required payments that are not made in a timely manner, together with interest on those liquidated damages running from September 3, 2007 to the date that any required payments are finally made.

4. To facilitate timely payment, the Tribes agree that, as a part of the notice provided pursuant to subsection 9.A(4), they will notify the State if there is a means for individual payees to receive required payments by wire transfer and that such payees will assist in the facilitation of wire transfer payments where possible. Where wire transfer is not possible, the Tribes agree that the notice provided pursuant to subsection 9.A(4) will designate a payee and mailing address for required payments that may be mailed.

D. So long as all the contingencies stated in subsection 9.A are fulfilled, the Tribes will not seek any access to tidelands where both (1) the tidelands would qualify as "covered tidelands" under the terms of this Settlement Agreement, and (2) the tidelands are subject to harvest by a person who may qualify to be an Intervenor Defendant under the terms of this Settlement Agreement. In every other respect, however, the Tribes may continue to exercise their rights pursuant to the Revised Shellfish Implementation Plan, including litigation of any disputes arising under the Revised Shellfish Implementation Plan.

E. In the event that another tribe or tribes may establish treaty shellfish rights to the covered tidelands, the Parties agree to follow the process outlined in the legislation pursuant to subsection 9.A(1) to consider the inclusion of such tribe or tribes in this Settlement Agreement.

## 10. PROPERTY HELD IN TRUST BY THE UNITED STATES.

The Growers agree that they will not oppose or object to the United States holding in trust any and all properties acquired by the Tribes pursuant to this Consent Decree and Settlement Agreement.

## 11. RESOLUTION OF DISPUTES.

All disputes arising in the interpretation, implementation and enforcement of this Settlement Agreement and the Revised

Shellfish Implementation Plan, including but not limited to disputes as to the definition and existence of natural shellfish beds, the qualifications of any person to become an intervenor-defendant pursuant to section 2, whether a particular tideland is covered within the meaning of section 5, and the suitability of any property offered for sale pursuant to section 8, shall be resolved as set forth in the Revised Shellfish Implementation Plan entered April 8, 2002 (or as thereafter amended). This Court retains continuing jurisdiction for this purpose.

## 12. RESERVATION OF RIGHTS.

Notwithstanding any other provision of this settlement, the State of Washington and the United States expressly reserve their rights and their discretion to consider, comment, and/or act upon any legislation, including appropriations, seeking to implement this agreement. Such consideration, comment, and/or action or lack thereof, shall not be deemed a breach of this agreement. Implementation of this Settlement Agreement by the United States or its agencies is subject to the requirements of the Anti–Deficiency Act, 31 U.S.C. Sec. 1341–1519, and the availability of appropriated funds. Nothing in this Settlement Agreement is intended or shall be construed to require the obligation, appropriation, or expenditure of any money by the State of Washington. As noted more fully in Section 9.A.2, Washington State has enacted a contingent appropriation of money in partial fulfillment of the funding requirements of this agreement. The determination of whether the contingencies to the Washington State budget appropriation have been met remains within the sole discretion of the State of Washington. Nothing in this Settlement Agreement is intended or shall be

construed to require the obligation, appropriation, or expenditure of any money from the U.S. Treasury, subject to the terms of any legislation passed consistent with section 9(A)(1)(d). The Parties acknowledge that the United States shall not be required under this Settlement Agreement to expend any appropriated funds unless and until an authorized official of the U.S. Department of the Interior affirmatively acts to commit to such expenditures in writing, subject to the terms of any legislation passed consistent with section 9(A)(1)(d).

## 13. GROWER ENHANCEMENT OF STATE–OWNED TIDELANDS.

To enhance recreational shellfish harvest opportunities for the citizens of Washington State, as a condition of this settlement agreement, the Growers agree to provide recreational shellfish enhancements to the State and its citizens as set forth in this section. Subject to the fulfillment of the provisions of section 7, the Growers shall each year for a period of ten years contribute to the State of Washington $50,000 worth of shellfish (Manila clam, Pacific oyster, Olympia oyster, or geoduck) enhancement to State-owned tidelands. The $50,000 dollar value to be contributed to the State and its citizens by the Growers each year for that ten year period shall be satisfied through any combination of the fair market value of shellfish seed and any grower-furnished labor, materials and equipment expended to assist the enhancement of State-owned tidelands. The State may choose how the Growers contribute the $50,000 shellfish enhancement through any combination of seed, the species of seed (Manila clam, Pacific oyster, Olympia oyster, or geoduck), and grower-furnished labor, materials and equipment expended in enhancing state-owned tidelands for recreational harvest. A voluntary committee of State,

Grower and Tribal representatives may be called by the State to meet annually to assist the State in determining what proportion of seed species and Grower-furnished enhancement efforts would be most useful to the State in increasing the shellfish resource available for recreational harvest on state-owned tidelands. Nothing is this section is intended to modify the Tribes' rights to harvest up to 50% of the harvestable shellfish from state-owned tidelands as provided in the Court's Implementation Order and as further clarified by decisions of this Court. In particular, without setting any precedent for situations that may arise in other contexts, the Tribes' rights to up to 50% of the harvestable shellfish from state-owned tidelands are preserved with respect to state-owned tidelands enhanced pursuant to this section.

DATED this ____ day of _____, 2007.

/s/

Carl J. Artman, Assistant Secretary—Indian Affairs

United States Department of the Interior

_____

David Bernhardt, Solicitor

United States Department of the Interior

_____ Christine

O. Gregoire, Governor State of

Washington

_____

Jeff P. Koenings Ph.D, Director

Washington Department of Fish and Wildlife

_____ Doug

Sutherland

## EXHIBIT B

## FEDERAL LEGISLATION

## IN FULFILLMENT OF ¶ 9.A.1

## UNITED STATES PUBLIC LAWS

**109th Congress—Second Session**

**Convening January 7, 2005**

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed.

PL 109–479 (HR 5946)

January 12, 2007

MAGNUSON–STEVENS FISHERY CONSERVATION AND MANAGEMENT REAUTHORIZATION

ACT OF

2006

An Act To amend the Magnuson–Stevens Fishery Conservation and Management Act to authorize activities to promote improved monitoring and compliance for high seas fisheries, or fisheries governed by international fishery management agreements, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

\* \* \*

TITLE VII—MISCELLANEOUS

Sec. 701. Study of the acidification of the oceans and effect on fisheries.

Sec. 702. Puget Sound regional shellfish settlement.

\* \* \*

SEC. 702. PUGET SOUND REGIONAL SHELLFISH SETTLEMENT.

(a) FINDINGS AND PURPOSES.—

(1) FINDINGS.—Congress finds that—

(A) the Tribes have established treaty rights to take shellfish from public and private tidelands in Washington State, including from some lands owned, leased, or otherwise subject to harvest by commercial shellfish growers;

(B) the district court that adjudicated the Tribes' treaty rights to take shellfish found that the growers are innocent purchasers who had no notice of the Tribes' fishing right when they acquired their properties;

(C) numerous unresolved issues remain outstanding regarding implementation of the Tribes' treaty right to take shellfish from lands owned, leased, or otherwise subject to harvest by the growers;

(D) the Tribes, the growers, the State of Washington, and the United States Department of the Interior have resolved by a settlement agreement many of the disputes between and among them regarding implementation of the Tribes' treaty right to take shellfish from covered tidelands owned or leased by the growers;

(E) the settlement agreement does not provide for resolution of any claims to take shellfish from lands owned or leased by the growers that potentially may be brought in the future by other Tribes;

(F) in the absence of congressional actions, the prospect of other Tribes claims to take shellfish from lands owned or leased by the growers could be pursued through the courts, a process which in all likelihood could consume many years and thereby promote uncertainty in the State of Washington and the growers and to the ultimate detriment of both the Tribes and other Tribes and their members;

(G) in order to avoid this uncertainty, it is the intent of Congress that other Tribes have the option of resolving their claims, if any, to a treaty right to take shellfish *3650 from covered tidelands owned or leased by the growers; and

(H) this Act represents a good faith effort on the part of Congress to extend to other Tribes the same fair and just option of resolving their claims to take shellfish from covered tidelands owned or leased by the growers that the Tribes have agreed to in the settlement agreement.

(2) PURPOSES.—The purposes of this section are—

(A) to approve, ratify, and confirm the settlement agreement entered into by and among the Tribes, commercial shellfish growers, the State of Washington, and the United States;

(B) to provide other Tribes with a fair and just resolution of any claims to take shellfish from covered tidelands, as that term is defined in the settlement agreement, that potentially could be brought in the future by other Tribes; and

(C) to authorize the Secretary to implement the terms and conditions of the settlement agreement and this section.

(b) APPROVAL OF SETTLEMENT AGREEMENT.—

(1) IN GENERAL.—The settlement agreement is hereby approved, ratified, and confirmed, and section 6 of the settlement agreement, Release of Claims, is specifically adopted and incorporated into this section as if fully set forth herein.

(2) AUTHORIZATION FOR IMPLEMENTATION.—The Secretary is hereby authorized to implement the terms and conditions of the settlement agreement in

accordance with the settlement agreement and this section.

(c) FUND, SPECIAL HOLDING ACCOUNT, AND CONDITIONS.—

(1) PUGET SOUND REGIONAL SHELLFISH SETTLEMENT TRUST FUND.—

(A) There is hereby established in the Treasury of the United States an account to be designated as the "Puget Sound Regional Shellfish Settlement Trust Fund". The Secretary shall deposit funds in the amount of $22,000,000 at such time as appropriated pursuant to this section into the Fund.

(B) The Fund shall be maintained and invested by the Secretary of the Interior pursuant to the Act of June 24, 1938 (25 U.S.C. 162a) until such time as all monies are transferred from the Fund.

(C) The Secretary shall transfer monies held in the Fund to each Tribe of the Tribes in the amounts and manner specified by and in accordance with the payment agreement established pursuant to the settlement agreement and this section.

(2) PUGET SOUND REGIONAL SHELLFISH SETTLEMENT SPECIAL HOLDING ACCOUNT.—

(A) There is hereby established in the Treasury of the United States a fund to be designated as the "Puget Sound Regional Shellfish Settlement Special Holding Account". The Secretary shall deposit funds in the amount of $1,500,000 into the Special Holding Account in fiscal year 2011 at such time as such funds are appropriated pursuant to this section.

*3651

(B) The Special Holding Account shall be maintained and invested by the Secretary of the Interior pursuant to the Act of June 24, 1938, (25 U.S.C. 162a) until such time as all monies are transferred from the Special Holding Account.

(C) If a court of competent jurisdiction renders a final decision declaring that any of the other Tribes has an established treaty right to take or harvest shellfish in covered tidelands, as that term is defined in the settlement agreement, and such tribe opts to accept a share of the Special Holding Account, rather than litigate this claim against the growers, the Secretary shall transfer the appropriate share of the monies held in the Special Holding Account to each such tribe of the other Tribes in the amounts appropriate to compensate the other Tribes in the same manner and for the same purposes as the Tribes who are signatory to the settlement agreement. Such a transfer to a tribe shall constitute full and complete satisfaction of that tribe's claims to shellfish on the covered tidelands.

(D) The Secretary may retain such amounts of the Special Holding Account as necessary to provide for additional tribes that may judicially establish their rights to take shellfish in the covered tidelands within the term of that Account, provided that the Secretary pays the remaining balance to the other Tribes prior to the expiration of the term of the Special Holding Account.

(E) The Tribes shall have no interest, possessory or otherwise, in the Special Holding Account.

(F) Twenty years after the deposit of funds into the Special Holding Account, the Secretary shall close the Account and transfer the balance of any funds held in the Special Holding Account at that time to the Treasury. However, the Secretary may continue to maintain the Special Holding Account in order to resolve the claim of an other Tribe that has notified the Secretary in writing within the 20–year term of that Tribe's interest in resolving

its claim in the manner provided for in this section.

(G) It is the intent of Congress that the other Tribes, if any, shall have the option of agreeing to similar rights and responsibilities as the Tribes that are signatories to the settlement agreement, if they opt not to litigate against the growers.

(3) ANNUAL REPORT.—Each tribe of the Tribes, or any of the other Tribes accepting a settlement of its claims to shellfish on covered lands pursuant to paragraph (2)(C), shall submit to the Secretary an annual report that describes all expenditures made with monies withdrawn from the Fund or Special Holding Account during the year covered by the report.

(4) JUDICIAL AND ADMINISTRATIVE ACTION.—The Secretary may take judicial or administrative action to ensure that any monies withdrawn from the Fund or Special Holding Account are used in accordance with the purposes described in the settlement agreement and this section.

(5) CLARIFICATION OF TRUST RESPONSIBILITY.—Beginning on the date that monies are transferred to a tribe of the Tribes or a tribe of the other Tribes pursuant to this section, \*3652 any trust responsibility or liability of the United States with respect to the expenditure or investment of the monies withdrawn shall cease.

(d) STATE OF WASHINGTON PAYMENT.—The Secretary shall not be accountable for nor incur any liability for the collection, deposit, management or nonpayment of the State of Washington payment of $11,000,000 to the Tribes pursuant to the settlement agreement.

(e) RELEASE OF OTHER TRIBES CLAIMS.—

(1) RIGHT TO BRING ACTIONS.—As of the date of enactment of this section, all right of any other Tribes to bring an action. to enforce or exercise its treaty rights to take shellfish from public and private tidelands in Washington State, including from some lands owned, leased, or otherwise subject to harvest by any and all growers shall be determined in accordance with the decisions of the Courts of the United States in *United States v. Washington,* Civ. No. 9213 (Western District of Washington).

(2) CERTAIN RIGHTS GOVERNED BY THIS SECTION.—If a tribe failing within the other Tribes category opts to resolve its claims to take shellfish from covered tidelands owned or leased by the growers pursuant to subsection (c)(2)(C) of this section, that tribe's rights shall be governed by this section, as well as by the decisions of the Courts in *United States v. Washington,* Civ. No. 9213.

(3) NO BREACH OF TRUST.—Notwithstanding whether the United States has a duty to initiate such an action, the failure or declination by the United States to initiate any action to enforce any other Tribe's or other Tribes' treaty rights to take shellfish from public and private tidelands in Washington State, including from covered tidelands owned, leased, or otherwise subject to harvest by any and all growers shall not constitute a breach of trust by the United States or be compensable to other Tribes.

(f) CAUSE OF ACTION.—If any payment by the United States is not paid in the amount or manner specified by this section, or is not paid within 6 months after the date specified by the settlement agreement, such failure shall give rise to a cause of action by the Tribes either individually or collectively against the United States for money damages for the amount authorized but not paid to the Tribes, and

the Tribes, either individually or collectively, are authorized to bring an action against the United States in the United States Court of Federal Claims for such funds plus interest.

(g) DEFINITIONS.—In this section:

(1) FUND.—The term "Fund" means the Puget Sound Shellfish Settlement Trust Fund Account established by this section.

(2) GROWERS.—The term "growers" means Taylor United, Inc.; Olympia Oyster Company; G.R. Clam & Oyster Farm; Cedric E. Lindsay; Minterbrook Oyster Company; Charles and Willa Murray; Skookum Bay Oyster Company; J & G Gunstone Clams, Inc.; and all persons who qualify as "growers" in accordance with and pursuant to the settlement agreement.

(3) OTHER TRIBES.—The term "other Tribes" means any federally recognized Indian nation or tribe other than the Tribes described in paragraph (6) that, within 20 years after the deposit of funds in the Special Holding Account, establishes a legally enforceable treaty right to take shellfish from covered *3653 tidelands described in the settlement agreement, owned, leased or otherwise subject to harvest by those persons or entities that qualify as growers.

(4) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(5) SETTLEMENT AGREEMENT.— The term "settlement agreement" means the settlement agreement entered into by and between the Tribes, commercial shellfish growers, the State of Washington and the United States, to resolve certain disputes between and among them regarding implementation of the Tribes' treaty right to take shellfish from certain covered tidelands owned, leased or otherwise subject to harvest by the growers.

(6) TRIBES.—The term "Tribes" means the following federally recognized Tribes that executed the settlement agreement: Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown S'Klallam, and Suquamish Tribes, the Lummi Nation, and the Swinomish Indian Tribal Community.

(7) SPECIAL HOLDING ACCOUNT.—The term "Special Holding Account" means the Puget Sound Shellfish Settlement Special Holding Account established by this section.

(h) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated $23,500,000 to carry out this section—

(A) $2,000,000 for fiscal year 2007;

(B) $5,000,000 for each of fiscal years 2008 through 2010; and

(C) $6,500,000 for fiscal year 2011.

### EXHIBIT C

### STATE LEGISLATION

### IN FULFILLMENT OF 119.A.2

remove lost and abandoned fishing nets and crab and shrimp pots that may be dangerous to humans and that unintentionally trap and kill endangered salmon and other aquatic species.

(((21))) (31) $4,000 of the wildlife account—state appropriation is provided solely to implement House Bill No. 1210 (temporary fishing license). If the bill is not enacted by June 30, 2005, the amount provided in this subsection shall lapse.

(32) Within existing appropriations and utilizing all available federal moneys allocated for the crab buy-back program, the department shall develop and implement a crab buy-back program that allows com-

mercial crab fishers the opportunity to sell their licenses back to the state and exit from the crabbing fishery. The department shall report to the office of financial management and the appropriate fiscal committees of the legislature its detailed implementation plan no later than December 1, 2006.

(33) $660,000 of the general fund—federal appropriation is provided solely to initiate a review of the hydraulic project approval permit rules and to undergo a public process for adoption of new or revised rules that my be needed. Upon completion, the department shall complete a habitat conservation plan for the hydraulic project approval program, and shall seek legislative review prior to adoption of new or revised rules.

(34) $125,000 of the state wildlife account—state appropriation is provided to implement Engrossed Senate Bill No. 5232 (turkey tags). If the bill is not enacted by June 30, 2006, the amount provided in this subsection shall lapse.

*Sec. 307 was partially vetoed. See message at end of chapter.*

**\*Sec. 308.** 2005 c 518 s 308 (uncodified) is amended to read as follows:

FOR THE DEPARTMENT OF NATURAL RESOURCES

General Fund--State Appropriation (FY 2006) . . . . . ((~~$49,220,000~~))
$40,473,000

General Fund--State Appropriation (FY 2007) . . . . . ((~~$43,757,000~~))
$53,999,000

General Fund--Federal Appropriation . . . . . . . . . ((~~$15,202,000~~))
$15,215,000

General Fund--Private/Local Appropriation . . . . . . ((~~$1,275,000~~))
$1,276,000

Forest Development Account--State Appropriation . . . ((~~$54,441,000~~))
$54,697,000

Off-Road Vehicle Account--State Appropriation . . . . . ((~~$3,986,000~~))
$4,001,000

Surveys and Maps Account--State Appropriation . . . . . ((~~$2,436,000~~))
$2,447,000

Aquatic Lands Enhancement Account--State
Appropriation . . . . . . . . . . . . . . . . . . . ((~~$8,344,000~~))
$8,451,000

Resources Management Cost Account--State
Appropriation . . . . . . . . . . . . . . . . . . . ((~~$85,941,000~~))
$86,332,000

Surface Mining Reclamation Account--State
Appropriation . . . . . . . . . . . . . . . . . . . ((~~$1,841,000~~))
$2,828,000.

Disaster Response Account--State
Appropriation . . . . . . . . . . . . . . . . . . . . $5,000,000

Water Quality Account--State Appropriation . . . . . . ((~~$2,630,000~~))
$2,636,000

Aquatic Land Dredged Material Disposal Site
Account--State Appropriation . . . . . . . . . . . . ((~~$652,000~~))
$1,321,000

Natural Resources Conservation Areas Stewardship
Account--State Appropriation . . . . . . . . . . . . . . $34,000

State Toxics Control Account--State Appropriation . . . . . $2,155,000

Air Pollution Control Account--State Appropriation . . . ((~~$555,000~~))
$556,000

Derelict Vessel Removal Account--State Appropriation . ((~~$1,137,000~~))
$1,138,000

Agricultural College Trust Management
Account--State Appropriation . . . . . . . . . . . . ((~~$1,962,000~~))
$1,966,000

Pension Funding Stabilization Account--State
Appropriation . . . . . . . . . . . . . . . . . . . . $136,000

TOTAL APPROPRIATION . . . . . . . . . . . . . . ((~~$280,568,000~~))
$284,661,000

The appropriations in this section are subject to the following conditions and limitations:

(1) As described in section 129(7) of this act, the department shall make recommen-

dations and report on monitoring activities related to salmon recovery.

(2) $18,000 of the general fund—state appropriation for fiscal year 2006, $18,000 of the general fund—state appropriation for fiscal year 2007, and $1,652,050 of the aquatic lands enhancement account appropriation are provided solely for the implementation of the Puget Sound conservation and recovery plan and agency action items DNR–01 and DNR–02.

(3) $138,000 of the resource management cost account—state appropriation is provided solely to implement Engrossed Second Substitute House Bill No. 1896 (geoduck harvest). If the bill is not enacted by June 30, 2005, the amount in the subsection shall lapse.

(4) ((($953,000))) $972,000 of the general fund—state appropriation for fiscal year 2006 and (($950,000)) $994,000 of the general fund—state appropriation for fiscal year 2007 are provided solely for deposit into the agricultural college trust management account and are provided solely to manage approximately 70,700 acres of Washington State University's agricultural college trust lands.

(5) ((4,10,635,000)) $10,689,000 of the general fund—state appropriation for fiscal year 2006, $13,635,000 of the general fund—state appropriation for fiscal year 2007, and $5,000,000 of the disaster response account—state appropriation are provided solely for emergency fire suppression. Of these amounts, up to $250,000 may be expended for staff and other necessary resources to design and implement a fire data-collection system that includes financial and performance-management information for fires over 10 acres in size.

None of the general fund and disaster response account amounts provided in this subsection may be used to fund agency indirect and administrative expenses. Agency indirect and administrative costs shall be allocated among the agency's remaining accounts and appropriations.

(6) $582,000 of the aquatic lands enhancement account appropriation is provided solely for spartina control.

(7) Fees approved by the board of natural resources in the 2005–07 biennium are authorized to exceed the fiscal growth factor under RCW 43.135.055.

(8) $9,000,000 of the general fund—state appropriation for fiscal year ((2006)) 2007 and $2,000,000 of the aquatic lands enhancement account—state appropriation are provided solely for the purposes of settling those claims identified in ((the consent decree and settlement agreement in)) *U.S., et al. v. State of Washington, et al.* Subproceeding No. 89–3 (Shellfish), United States District Court for the Western District of Washington at Seattle, Case No. C70–9213. The expenditure of this appropriation is contingent on ((the release of those claims in this subproceeding. In the event that the federal government does not appropriate $22,000,000 for this purpose by June 30, 2006,)) a settlement agreement that includes the state of Washington as a party to the agreement which is fully executed by June 29, 2007, and a consent decree entered by June 29, 2007, by the United States District Court for the Western District of Washington settling and releasing the identified treaty claims to harvest shellfish previously negotiated in the settlement agreement. By June 29, 2007, the release of claims associated with the settlement agreement and consent decree must be fully effective and there must be no unfulfilled contingencies that could cause the settlement agreement or consent decree to be vacated at some future date if not fulfilled. In the event that these contin-

gencies are not met, the amounts provided in this subsection shall lapse.

(9) $2,155,000 of the state toxics account—state appropriation is provided solely for the department to meet its obligations with the U.S. environmental protection agency for the clean-up of Commencement Bay and other sites.

(10) The department shall not develop the Gull Harbor facility without first submitting a master plan to the appropriate committees of the legislature. The plan shall ensure continued public access to the waterfront. The plan shall also examine alternative locations to the Gull Harbor site that would colocate marine equipment for all state agencies needing water access in Thurston county. The report shall be submitted by December 1, 2006.

(11) $250,000 of the general fund—state appropriation for fiscal year 2006, $250,000 of the general fund—state appropriation for fiscal year 2007, and $500,000 of the resource management cost account—state appropriation are provided solely for a report on the future of Washington forests. The purpose of the report is to examine economic.

### EXHIBIT D

### TRIBES' PAYMENT ALLOCATION

### AGREEMENTS

### IN FULFILLMENT OF ¶ 9.A.4

THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs,

vs.

STATE OF WASHINGTON, et al., Defendants.

Civil No. C70–9213

Subproceeding No. 89–3 (Shellfish)

NOTICE OF COMPLIANCE WITH SHELLFISH SETTLEMENT AGREEMENT SECTION 9.A(4)

Section 9.A(4) of the Shellfish Settlement Agreement provides that the Agreement is expressly conditioned and contingent on the following: "By May 15, 2007, the Tribes that are parties to this Settlement Agreement unanimously agree in writing on the payee or payees, and the allocation of payments to be made, for receipt of the funds appropriated pursuant to subsections 9.A(1) and (2), and serve such writing on the other parties to this agreement."

All Tribes party to the Settlement Agreement have agreed, in writing, on the allocation of payments and the payees for those payments, as required by Section 9.A(4). Those allocations, and the designation of the names and mailing addresses of the payees, are set forth in the attached documents: South Puget Sound Tribes' Notice Of Agreement Re: Allocation Of Shellfish Settlement Funds And Payee, with signatures in counterpart; Hood Canal and Strait of Juan de Fuca Regional Shellfish Settlement Fund Memorandum of Agreement, with signatures in counterpart; North Sound Tribes Settlement Agreement, with signatures in counterpart. These documents and this notice have been served on all other parties by electronic mail, with hard copies placed in the mail, on this 15th day of May, 2007. As required by section 9.C(4) of the Shellfish Settlement Agreement, the tribes notify the State that there is presently no means for individual payees to receive the required payments by wire transfer.

The Tribes have therefore fulfilled the contingency set forth in Section 9.A(4).

Respectfully submitted this 15th day of May, 2007.

KANE & KATZEN, PLLC

s/ PHILLIP E. KATZEN, WSBA # 7835

Tribal Co-lead Counsel

MORISSET, SCHLOSSER, JOZWIAK AND

s/MASON D. MORISSET, WSBA # 273

Tribal Co-lead Counsel

## SOUTH PUGET SOUND TRIBES' NOTICE OF AGREEMENT RE: ALLOCATION OF SHELLFISH SETTLEMENT FUNDS AND PAYEE

WHEREAS, section 9.A(4) of the Shellfish Settlement Agreement provides that the Agreement is expressly conditioned and contingent on the following, *inter alia:* "By May 15, 2007, the Tribes that are parties to this Settlement Agreement unanimously agree in writing on the payee or payees, and the allocation of payments to be made, for receipt of the funds appropriated pursuant to subsections 9.A(1) and (2), and serve such writing on the other parties to this agreement";

WHEREAS, the Squaxin Island Tribe, the Nisqually Indian Tribe, and the Puyallup Indian Tribe (collectively, the "South Puget Sound Tribes") has each approved the South Puget Sound Regional Shellfish Settlement Fund Trust Agreement ("Trust Agreement");

WHEREAS, the South Puget Sound Tribes desire to provide notice of their unanimous agreement as to the allocation of Shellfish Settlement Agreement funds and as to the payee for funds allocated to the South Puget Sound Tribes;

WHEREAS, each of the undersigned is authorized to enter this Notice of Agreement;

THEREFORE, in satisfaction of section 9.A(4), the South Puget Sound Tribes hereby provide the following Notice of Agreement, consistent with their Trust Agreement

All payments under the Shellfish Settlement Agreement, whether from the United States or the State of Washington, shall be allocated as follows: the South Sound regional allocation shall be fifteen million dollars payable as 45.454545% of each payment,-whether the payment is from the United States or the State of Washington; the North Sound regional allocation shall be eight million dollars payable as 24.242424% of each payment, whether the payment is from the United States or the State of Washington; and the Hood Canal/Strait of Juan de Fuca regional allocation shall be ten million dollars payable as 30.303030% of each payment, whether the payment is from the United States or the State of Washington.

All South Sound regional allocation payments shall be made and delivered to Charles Schwab & Co., Inc., 1148 Broadway, Suite 110, Tacoma, Washington, 98402, Account No. 90766958.

Dated this 14th of May, 2007.

---

Squaxin Island Tribe

By: Kevin Lyon, Tribal Attorney

/s/

Nisqually Indian Tribe

By: Bill Tobin, Tribal Attorney

---

Puyallup Indian Tribe

By: Samuel Stiltner, Tribal Attorney

## HOOD CANAL AND STRAIT OF JUAN DE FUCA REGIONAL SHELLFISH SETTLEMENT FUND MEMORANDUM OF AGREEMENT

### A. Parties

The Parties to this Memorandum of Agreement (MOA) are the Port Gamble S'Klallam, Skokomish, Makah, Lower Elwha Klallam and Jamestown S'Klallam Tribes.

### B. Purpose

The Purpose of this MOA is to provide instructions for the Parties' funds received from the Puget Sound Regional Shellfish Agreement and Consent Decree (Settlement Fund) to be entered in *United States v. Washington,* Case No. C70–9213, Subproceeding 89–3. This MOA also outlines a the frame and specific actions the Parties-will engage-in to develop a Long Term Agreement regarding the use of these funds.

The payments from the United States and the State of Washington are as follows:

1. From the United States:

$2,000,000 by September 3, 2007; plus

$5,000,000 by September 3, 2008; plus

$5,000,000 by September 3, 2009; plus

$5,000,000 by September 3, 2010; plus

$5,000,000 by September 3, 2011; and

2. From the State of Washington:

$11,000,000 will be disbursed by September 3, 2007.

### C. Regional Share from the Settlement Fund

The Parties' Hood Canal and Strait of Juan de Fuca (FIC/S3F) regional allocation & Jim the total payments is $10 million, payable as 30,303030% of each payment, whether each payment is from the United States or the State of Washington.

The Parties to this MOA recognize that the South Sound regional allocation from the total payments is $15 million, payable as 45.454545% of each payment, whether each payment is from the United States or the State of Washington; and that the North. Sound regional allocation from the total payment is $8 million, payable as 24.242424% of each payment, whether each payment is from the United States or the State of Washington.

### D. Temporary Trust Account

The Parties agree that the fast payment amounts, $3,333,333.33 from the State payment and $606,060.61 from the U.S. payment, for a total of S3,939,393.94 will barnacle payable to, and deposited in, the Temporary Trust Account of Attorney Phil Katzen, of Kati & Matzen, PLLC, 100 South King Street, Suite 560, Seattle, WA 98104. This will be disbursed, along with any interest earned, pursuant to the terms of section "E" below.

When a Joint Investment Vehicle has been selected pursuant to section "E" below, the United States and State of Washington will be notified of the new recipient of the funds to replace the Kanji & Katzen Temporary Trust Account. However, If a new Joint Investment Vehicle, pursuant to section "E" below, is not established by the time of the second and future payment(s) are made, payments will continue to be made to this Temporary Trust Account trail notification of anew Joint Investment Vehicle or Long Terra Agreement bee been. provided to the United States and the State of Washington.

### E. Joint Investment Vehicle

The Parties agree to meet within thirty days from the execution of this agreement to establish an agreed upon joint investment vehicle. In order to accomplish this, and seek the best advice on establishing a

safe and positive return, the Parties agree to consult with financial advisor(s). When a replacement investment vehicle has been selected and approved by the Parties, the entire balance in the temporary trust account (see "D" above) will be transferred in accordance with the Parties' instructions.

The Parties farther agree that no individual Tribe shall have access to either the Temporary Trust Account or the Joint Investment Vehicle until a long-term agreement (see "F" below) regarding the management and for distribution of the total HUSH portion of the Regional Settlement Fund has been developed.

### F. Long Term Agreement

The Parties agree to jointly develop a Long Tenn Agreement for the management and distribution of the proceeds from the HC/SJF Regional Settlement Fund. Ones executed, it shall replace this Memorandum. & Agreement.

The Parties agree that they will meet no less than once per quarter in an effort to reach a permanent agreement concerning the best use of the funds, and that joint meeting locations shall rotate between the Tribes. The Parties agree to exercise good, faith and prudent management practices in all their transactions and negotiations.

### G. Agreement Facilitation

If the Parties have not succeeded in completing a Long Term Agreement by September 3,2011, which is the date of the fired payment by the United States, the Parties may submit to mediation, with a mediator to be chosen by the Parties. The costs of any mediation process shall be borne equally by The Parries to this Agreement. The funds, including future HC/SJF Regional Settlement Fund pay-

ment and earnings shall remain in the Joint Investment Vehicle until a Long Term Agreement has been finalized regarding their use.

Executed on the 11 of May, 2007, by the undersigned representatives of the Parties

*For the Port Gamble S'Klallam Tribe*

/s/ (name)

Chairman

_____ (title)

*For the Makah Tribe*

/s/ (name)

Chairman

_____ (title)

*For the Jamestown S'Klallam Tribe*

/s/ (name)

Chairman

_____ (title)

*For the Skokomish Tribe*

/s/ (name)

Chairman

_____ (title)

*For the Lower Elwha Klallam Tribe*

_____ (name)

_____ (title)

### NORTH SOUND TRIBES SETTLEMENT AGREEMENT

AGREEMENT entered into this 15th day of May, 2007, by and among the following federally recognized Indian Tribes holding Treaty fishing rights reserved in the Treaty of Point Elliott the Lummi Nation ("Lummi"), the Upper Skagit Indian Tribe ("Upper Skagit"), Swinomish Indian Tribal Community ("Swinomish"), the Tulalip Tribes ("Tulalip"), the Suquamish Tribe ("Suquamish"), the Muckleshoot Indian Tribe ("Muckleshoot"), the Nooksack

Tribe ("Nooksack"), the Sauk–Suiattle Indian Tribe (Sauk–Suiattle), and the Stillaguamish Tribe ("Stillaguamish"), which have been identified as the "North Sound Tribes" in a certain settlement agreement with. Shellfish Grower parties in the litigation known as *United States v. Washington* ("Shellfish Settlement Agreement") and shall be referred to as the "North Sound Tribes" in this Agreement. This instant agreement shall be identified as the "North Sound Agreement" or "Agreement";

WHEREAS, many of the parties in *U.S. v. Washington,* Subproceeding 89–3 ("Shellfish Litigation"), including Swinomish, Suquamish, Muckleshoot, and Nooksack who are parties to this Agreement have entered into or approved the Shellfish Settlement Agreement, a copy of which is attached hereto and made a part hereof as Exhibit A (the "Settlement Agreement"); and

WHEREAS, neither Upper Skagit nor Tulalip have approved the Shellfish Settlement Agreement nor executed any document or resolution which would require them to sign the Shellfish Settlement Agreement; and

WHEREAS, Lummi, has indicated that it is not bound by its earlier resolution to support the Shellfish Settlement Agreement, which resolution has expired by its terms. Lummi has now indicated its willingness to approve the Shellfish Settlement Agreement; and

WHEREAS, the parties hereto are desirous of settling certain issues among themselves as sovereigns and, after the execution of this North Sound Agreement, authorizing and signing the Shellfish Settlement Agreement. Those issues include: 1) the distribution of moneys designated for the North Sound Tribes; 2) the determination of which tribes will have the right to the purchase tideland properties in Samish Bay which must be offered for sale by certain non-Indian shellfish growers ("Growers") pursuant to the Shellfish Settlement Agreement; and 3) the nature of the rights a Tribe acquires, as against the other parties to this Agreement, upon purchasing such tidelands or any other tidelands in any location.

NOW THEREFORE, in consideration of the mutual promises contained herein, the payments provided for herein and other good and valuable consideration, the parties hereto hereby agree as follows:

1. a.) Solely for the purposes of this North Sound Agreement as part of the Shellfish Settlement Agreement the "Payee Tribes" shall be and be deemed to be Lummi, Upper Skagit, Swinornish, Tulalip, Suquamish, Muckleshoot, and Nooksack;

b.) The Sauk–Suiattle and Stillaguamish Tribes are each holders of the right of taking fish under the Treaty of Point Elliott and as signatories of this agreement are not precluded from participation to the extent applicable upon establishing their respective usual and accustomed fishing areas.

2. The sum of $8.0 million dollars provided to go to the North Sound Tribes shall be paid and distributed to the Payee Tribes equally, each tribe receiving $1,142,857.14 in principal distributions. Payment shall be made in installments as specified herein. Disbursement of each installment payment chill be made within ten (10) business days of the date on which such funds are made available for distribution. Interest and other earnings on the settlement funds shall follow principal and shall be distributed with each installment in equal shares to the North Sound Tribes.

3. a.) The 40 acres of tidelands to be available for purchase from the Growers in Samish Bay as set forth in the Settlement Agreement shall be available for purchase exclusively by a consortium consisting of Lummi, Upper Skagit, and Swinomish, based upon the U and A rights of those Tribes in Samish Bay, each member of the consortium contributing its share of the acquisition cost, including, without limitation, all costs associated with title, inspections, closing, division and placing the tidelands (or any portion thereof) into trust, if the three Tribes so desire. If these tidelands are to be partitioned among these three Tribes, each Tribe shall be responsible for the costs related to its parcel(s) after partition. Nothing herein implies that any Point Elliott Treaty Tribe does not have usual and accustomed fishing grounds and stations in Samish Bay. b.) Nothing in this section shall prohibit a tribe from purchasing tidelands from a Grower in Samish Bay, which purchase is for tidelands not included in the Grower's Samish Bay offer in Section 8 of the Shellfish Settlement Agreement.

c.) With respect to section 3(a) above, if the members of the consortium purchase more than 40 acres, then the additional acreage above 40 acres shall be deemed sections 3(6) and 7 acreage. As to such acreage in excess of 40 acres, the consortium shall designate the 40 acres which it wishes to purchase under section 3(a) and the remaining acreage shall be controlled by section 7.

4. Lummi, Upper Skagit and Swinomish shall take steps consistent with buying the said 40 acres, which steps will include either buying the property or properties, offering to purchase the properties, placing earnest money down for such purchase or purchases and/or, if necessary, seeking court assistance if Lummi, Upper Skagit, and Swinomish believe that either the property or properties offered or the price at which the property is offered is in violation of the Growers' good faith agreement in the Settlement Agreement.

5. Nothing prohibits or limits the funds which Lummi, Upper Skagit and Swinomish are able to use in order to purchase the said 40 acres.

6. As to consortium issues, including the manner and timing of the management of the 40 acres and any potential ceremonial, subsistence and / or commercial use and enhancement of the resources of the property or properties, Lummi, Upper Skagit and Swinomish shall reach joint agreement on such matters through further discussions, negotiations and unanimous consent. Such consortium agreements shall be by separate agreement and not a part of this North Sound Agreement.

7. There are no restrictions prohibiting any of the parties hereto from purchasing tidelands in Samish Bay or any other area under section 3(b) and 3(c). Upon making such purchase, the parties shall take the same rights and responsibilities as a private citizen under the Shellfish Implementation Plan.

8. Nothing in this Agreement shall affect, extinguish, create, increase or decrease any party's court adjudicated usual and accustomed fishing rights or claims.

9. If a tribe purchases private tidelands within the Point Elliott Treaty area, and on those tidelands there exists a shellfish population that is subject to g & A harvest rights of one or more Point Elliott tribes and the purchasing tribe,

as the new owner of that property, enhances and increases production, then the extent of U & A harvest rights shall be based on the natural production levels revealed in a survey done originally at or near the time of purchase and not on the increase of production from the efforts of the owner tribe in the same manner as has been required under the Shellfish implementation procedures with other private property owners in the past and future.

10. The provisions of this Agreement apply only to, inhere in and are binding upon the signatory parties to this Agreement. This Agreement is not intended to create any third party beneficiaries with respect to the rights and obligations in this Agreement.

11. With respect to the consortium interests and activities concerning the 40 acres obtained pursuant to paragraph· 3(a) set forth above, the parties hereto agree that only Upper Skagit, Swinomish and Lummi have standing to raise an issue with respect to the enforcement of such provisions.

12. This North Sound Agreement shall not be effective unless and until all parties to this Agreement approve and execute the Shellfish Settlement Agreement.

13. a.) The North Sound Tribes hereby agree that, pursuant to the Shellfish Settlement Agreement, they shall receive collectively 24.242424% of the $33 million settlement funds, which when divided equally among the Payee Tribes as set forth above, equals 3.4632035% each.

b.) The North Sound Tribes also agree that the remaining settlement funds shall be disbursed to the other tribes/tribal regions identified in the Shellfish Settlement Agreement

as follows: 45.454545% to "South Sound" Tribes and 30.303030% to "Hood Canal/Strait of Juan de Fuca" Tribes, to be directed to such payee or payees and in such amounts as the South Sound Tribes and the Hood Canal/Strait of Juan de Fuca Tribes, respectively, may agree This provision constitutes the agreement of the North Sound Tribes. to these payee designations required by Section 9.A.4. of the Shellfish Settlement Agreement.

14. The North Sound Tribes hereby agree that each disbursement to each Payee Tribe under the Shellfish Settlement Agreement shall be made in the percentage and as provided above with the payment for that tribe delivered to the Chairman of that tribe at the tribal address set forth below.

15. This agreement may be signed in counterparts. Upon signature, the originals shall 13e faxed to the Upper Skagit Indian Tribe at (360) 854–7052 and the originals mailed to the Upper Skagit Indian Tribe, attention Harry Chesnin. When all fax signatures are received by the Upper Skagit Indian Tribe, this Agreement shall be binding upon all the parties hereto and Upper Skagit shall notify all parties by email that the Agreement is binding and shall return a fully executed copy to the chairperson of each signatory tribe at the addresses set forth below.

Swinomish Indian Tribal Community

By: _____

M. Brian Cladoosby, Chairman

11404 Moorage Way,

POB 817

LaConner WA 98257.

## ORDER AND CONSENT DECREE APPROVING SETTLEMENT AGREEMENT

Subproceeding No. 89–3 (Shellfish)

(June 21, 2007)

IT IS HEREBY ORDERED:

■ The Court, having reviewed the Joint Motion for Order And Consent Decree Approving Settlement Agreement, including the June 20, 2007 Settlement Agreement and other documents, finds that the Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent · with applicable law, in good faith, and in the public interest. The Settlement Agreement is hereby approved and incorporated as a Consent Decree and Order of this Court.

## JOINT MOTION FOR ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

Note On Motion Calendar: June 29, 2007

(June 29, 2007)

The Parties identified below seek this Court's entry of an Order that approves the Parties' Consent Decree And Settlement Agreement, attached hereto as Exhibit A. The Parties to this Consent Decree and Settlement Agreement, which addresses the minimum density of geoduck clams, are as follows:

Plaintiff Indian Tribes: Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown S'Klallam, Suquamish and Swinomish ("Tribes");

Plaintiff United States of America;

Defendant State of Washington; and

Intervenor–Defendant Puget Sound Shellfish Growers: Taylor United, Inc.; Olympia Oyster Company; G.R. Clam & Oyster Farm; Cedric E. Lindsay; Minterbrook Oyster Company; Charles and Willa Murray; Skookum Bay Oyster Company; and J & G Gunstone Clams, Inc. ("Growers").

The undersigned representatives of the Parties affirm and agree that the Consent Decree and Settlement Agreement is fair and reasonable and, by the signatures of their representatives below, the Parties consent to and are fully bound by all its terms.

Each undersigned representative of the Parties to this Consent Decree and Settlement Agreement certifies that he or she is fully authorized by that Party to enter into and execute the terms and conditions of this Joint Motion for Order Approving Consent Decree and Settlement Agreement, and to legally bind such Party to the Order and the Settlement Agreement. By their representatives' signatures below, the Parties consent to the entry of the Order Approving the Consent Decree and Settlement Agreement.

## EXHIBIT A

HONORABLE RICARDO MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs,

vs.

STATE OF WASHINGTON, et al., Defendants

Case No.: C70–9213

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

## CONSENT DECREE AND SETTLEMENT AGREEMENT

The Tribes listed in section 1 ("Tribes"), the Intervenor–Defendant Puget Sound Shellfish Growers ("Growers"), and the State of Washington, by and through their undersigned counsel of record, hereby submit this Consent Decree and Settlement Agreement to this Court for its approval.

**WHEREAS** the Tribes have asserted treaty right claims to take shellfish from tidal and sub-tidal lands owned within the case area in Washington State, which claims have resulted in the following decisions and orders:

1. *United States v. Washington,* 873 F.Supp. 1422 (W.D.Wash.1994).

2. *United States v. Washington,* 898 F.Supp. 1453 (W.D.Wash.1995) (establishing a Shellfish Implementation Plan— hereinafter the "Shellfish Implementation Plan").

3. *United States v. Washington,* 909 F.Supp. 787 (W.D.Wash.1995).

4. *United States v. Washington,* 157 F.3d 630 (9th Cir.1998).

5. A Stipulation And Order Amending Shellfish Implementation Plan, dated April 8, 2002) (hereinafter the "Revised Shellfish Implementation Plan");

**WHEREAS** the Revised Shellfish Implementation Plan envisions the development of "Exhibit A," a table of shellfish density values for several species of shellfish, in several regions, and for multiple time periods, the purpose of which is to implement the "staked or cultivated" proviso of the various Stevens Treaties (the "Shellfish Proviso") as further articulated in the opinions and orders under *U.S. v. Washington;*

**WHEREAS** the parties are currently engaged in a dispute resolution sub proceeding to establish density values in Exhibit A for four species of shellfish (geoduck, pacific oysters, manila clams and native littleneck clams); and

**WHEREAS** the Tribes, the Growers and the State of Washington are interested in resolving any and all disputes between and among them regarding the appropriate geoduck density value to be applied to aquaculture proposals, they agree as follows.

## CONSENT DECREE AND SETTLEMENT AGREEMENT

### 1. TRIBES.

The Tribes bound by this Consent Decree and Settlement Agreement are the Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown S'Klallam, Suquamish, and the Swinomish Tribes (hereinafter "Tribes") and any other tribe that may be added by agreement or by subsequent order of this Court. The Tribes are parties to the following treaties: Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132); Treaty of Point Elliott, January 26, 1855 (12 Stat. 927); Treaty of Point No Point, January 26, 1855 (12 Stat. 933); Treaty with the Makah, January 31, 1855 (12 Stat. 939) (hereafter "the treaties").

### 2. AQUATIC LANDS COVERED.

This Consent Decree and Settlement Agreement binds the State of Washington, the Growers and the Tribes with respect to intertidal and subtidal lands covered by

Exhibit A to the Revised Shellfish Implementation Plan or any successor Shellfish Implementation Plan.

## 3. GEODUCK MINIMUM DENSITY VALUE ESTABLISHED

**General Density Value for the Revised Shellfish Implementation Plan:** For purposes of aquaculture of geoduck, the geoduck density for all regions and time periods in Exhibit A shall be set at 0.01 geoducks per square foot for the life of this agreement.

**Geoduck Beds Identified as "Commercial Beds" in Tract Index Maps:** Any subtidal geoduck bed that has been identified as a "commercial bed" in any Commercial Geoduck Tract Index Maps jointly developed by the Tribes and the Washington State Department of Fish and Wildlife, or that is so designated in the future, shall be treated as meeting the 0.01 threshold density of Exhibit A. In the event that intertidal beds of geoducks are added to the Commercial Geoduck Tract Index Maps and designated as a "commercial bed" they shall be treated as meeting the 0.01 threshold density of Exhibit A.

**Geoduck Beds Actually Fished for Commercial Purposes:** Any subtidal beds of geoducks that have previously been fished commercially pursuant to a state or tribal fishery that was opened pursuant to an agreed fishery plan, or a notice provided pursuant to Section 4.6 of the Revised Shellfish Implementation Plan, shall be treated as meeting the 0.01 threshold density of Exhibit A. Subtidal beds of geoduck clams fished commercially prior to August 28, 1995 pursuant to the State's Subtidal Geoduck Dive Fishery program shall also be treated as meeting the 0.01 threshold density of Exhibit A. Where geoduck aquaculture is proposed on intertidal aquatic land that may have been fished commer-

cially in the past, such land shall be assessed to determine whether it meets the 0.01 minimum density value for the purposes of this Consent Decree and Settlement Agreement.

If subtidal or intertidal aquatic lands have beds of geoduck clams that have assessed densities of less than 0.01 geoducks per square foot at the time future commercial fishing activity occurs, those beds shall not be treated as meeting the 0.01 threshold density of Exhibit A, unless the parties mutually agree otherwise.

## 4. TERMS APPLIED SOLELY FOR TREATY PURPOSES

The establishment of a geoduck minimum density value for Exhibit A in this agreement shall not be used to limit or expand any treaty rights to harvest shellfish, identify the existence or absence of natural populations of geoduck, or determine estimates of biomass available for harvest. Any use of the established geoduck minimum density value of Exhibit A shall be limited to the application of the shellfish treaty harvest principles enumerated in the Revised Shellfish Implementation Plan and the orders and decisions interpreting and applying the Shellfish Proviso.

## 5. PROTOCOLS FOR ASSESSING GEODUCK DENSITY LEVELS

The density value for a tract of land that is proposed for aquaculture will be computed as an average value across the area that is proposed for aquaculture cultivation, except to the extent that the proposed area exceeds the size limits stated below. In that case separate average density values will be established for each individual plot and the terms of the Revised Shellfish Implementation Plan will be applied to each plot individually. The computation of an average density value

for intertidal tracts shall also be computed based upon the upper tidal elevation limit stated below.

The parties acknowledge that geoduck clams are not uniformly distributed when naturally set. To address the risk that commercially interesting conglomerations of clam may be obscured in the assessment of a tract proposed for aquaculture, and to establish a commercially rational and orderly basis for the assessment conducted pursuant to the Revised Shellfish Implementation Plan, the parties agree to employ the following criteria and processes for the development of survey and/or assessment protocols for any proposed geoduck aquaculture activity:

a. For intertidal beaches: If the area proposed for cultivation exceeds one acre, the identified area will be segmented into separate plots of one acre or less, and the geoduck density value shall be established for each plot. This is not a limitation on the overall size of a proposed intertidal aquaculture tract, but instead a limit on the scale at which geoduck density values are established. Accordingly, each proposed intertidal aquaculture site in excess of one acre will have a separate geoduck density values reported and applied for that plot. The division of a designated aquaculture site into multiple plots shall be undertaken according to protocols agreed upon in accordance with subsection 5(c), below.

For intertidal beaches, geoduck density values will be established by an initial harvest of the entire wild stock on each identified plot, provided that such harvest of the entire wild stock is done pursuant to a written agreement between the State or Grower and affected Tribes, including who will conduct the harvest and how the harvested geoduck

will be shared. Where a plot is determined to have a density below 0.01 geoduck per square foot, the Tribes' right to a share of geoduck from that plot will not continue beyond the initial harvest. Where a plot is determined to have a density at or above 0.01 geoduck per square foot, the Tribes' rights will continue as provided by this Settlement Agreement and the Revised Shellfish Implementation Plan.

For intertidal beaches, the computation of an average geoduck density value of the tract of land that is proposed for aquaculture shall not include any portion of the tract that lies above the tidal elevation of +1.0 feet (MLLW).

b. For subtidal areas: If the area proposed for cultivation exceeds three acres, the identified area will be segmented into separate plots of three acres or less, and the geoduck density value shall be established for each plot. The three-acre maximum is not a limitation on the overall size of a subtidal aquaculture tract that may be proposed for lease, but instead a limit on the scale at which geoduck density values are established. Accordingly, proposed subtidal aquaculture sites in excess of three acres will have separate geoduck density values reported and applied for each identified plot within the proposed lease site. The division of a designated aquaculture site into multiple plots shall be undertaken according to protocols agreed upon in accordance with subsection 5(c), below.

For subtidal beds, geoduck density values will be established by a survey of the wild stock on each identified plot.

c. The State, the Growers and the Tribes agree to work cooperatively to develop more specific protocols for surveys, for division into multiple plots of areas exceeding one and three acres,

(for intertidal and subtidal beds, respectively), and for the role of show factors in calculating densities from surveys and harvests, to give effect to these provisions. If recreational geoduck catch estimates can reliably assist in the assessment of the geoduck density of State-owned aquatic lands that are proposed for geoduck aquaculture, that information will be factored into the density assessment.

## 6. TERM OF THIS AGREEMENT AND CONTINUED APPLICATION OF ITS PROVISIONS

**Durability of Geoduck Density Threshold Determinations Made With Respect to Specific Aquaculture Proposals:** For purposes of determining whether an area or plot proposed for geoduck aquaculture meets the density threshold of Exhibit A, the procedures of the Revised Shellfish Implementation Plan and the orders and decisions interpreting and applying the Shellfish Proviso to proposed aquaculture activity will be applied. This principle shall apply notwithstanding any other limitation on the duration of this Consent Decree and Settlement Agreement.

**Continuing Ability to Apply the Agreed Geoduck Density Threshold:** The parties agree that the minimum density established in Section 3 of this Consent Decree and Settlement Agreement, and the other provisions of this Consent Decree and Settlement Agreement that provide for the application of that density level to new geoduck aquaculture activities, shall apply for a period of 25 years from the effective date of this Consent Decree and Settlement Agreement unless renewed or revised by mutual agreement of the parties.

The parties agree to convene a meeting of State, Grower and Tribal representatives at least one year in advance of the expiration of these terms to consider the advisability of extending those terms of this agreement, or modifying the agreement to reflect conditions prevailing at that time.

**Agreements to renew or Modify the Terms of this Consent Decree and Settlement Agreement:** Any renewal or modifications of this Consent Decree and Settlement Agreement may be undertaken by mutual written agreement between the State, the Growers and any affected Tribe(s) without further action by the court.

**Procedures in the event of Non–Renewal:** In the event that this Consent Decree and Settlement Agreement expires, the minimum density to be utilized for purposes of the revised Shellfish Implementation Plan shall be determined pursuant to the dispute resolution provisions of that Plan.

## 7. REVIEW COMMITTEE

The parties agree to form a committee of State, Grower and Tribal representatives to informally address and attempt to resolve specific issues that may arise from the implementation of this Consent Decree and Settlement Agreement.

## 8. RESOLUTION OF DISPUTES.

All disputes arising in the interpretation, implementation and enforcement of this Settlement Agreement and the Revised Shellfish Implementation Plan that are not resolved informally shall be resolved as set forth in the Revised Shellfish Implementation Plan entered April 8, 2002 (or as thereafter amended). This Court retains continuing jurisdiction for this purpose.

## 9. MINIMUM DENSITY FOR GEO-DUCK NOT A PRECEDENT FOR OTHER SPECIES.

The minimum density for geoduck established by this Consent Decree and Settlement Agreement is based upon a negotiated number that does not reflect the legal positions or factual contentions of either the State, the Growers or the Tribes; it is not based upon any particular method, formula or other calculation that could be used to determine the minimum density or sustainability for any other species or for geoduck in the absence of this agreement. The minimum density for geoduck established by this Consent Decree and Settlement Agreement should not be used or referred to in any manner or for any purpose as part of the dispute resolution proceedings to determine the minimum density or sustainability of any species.

Respectfully submitted this 29th day of June, 2007.

PLAINTIFF INDIAN TRIBES,

By: s/ PHILLIP E. KATZEN

Phillip E. Katzen, WSBA # 7835

Cory J. Albright, WSBA # 31493

KANJI & KATZEN, PLLC

100 S. King Street, Suite 560

Seattle, WA 98104

Counsel for the Suquamish, Jamestown S'Klallam, Lower Elwha Klallam, Port Gamble S'Klallam, Nisqually, Sauk–Suiattle, Skokomish, Squaxin Island, and Stillaguamish Tribes

By: s/ MASON D. MORISSET

Mason D. Morisset, WSBA # 273

MORISSET, SCHLOSSER, et al.

801 Second Ave., Suite 1115

Seattle, WA 98104

Counsel for the Tulalip Tribes

By: s/ LORI E. NIES

Lori E. Nies, WSBA # 26652

SKOKOMISH INDIAN TRIBE

North 80 Tribal Center Rd.

Skokomish Nation, WA 98584

Co–Counsel for the Skokomish Indian Nation

By: s/ ALIX FOSTER

Alix Foster, WSBA # 4943

SWINOMISH INDIAN TRIBAL COMMUNITY

PO Box 817

LaConner, WA 98257

Counsel for the Swinomish Indian Tribal Community

By: s/ KEVIN R. LYON

Kevin R. Lyon, WSBA # 15076

SQUAXIN ISLAND LEGAL DEPARTMENT

SE 3711 Old Olympic Hwy.

Shelton, WA 98584

Co–Counsel for the Squaxin Island Tribe

By: s/ MICHELLE HANSEN

Michelle Hansen, WSBA # 14051

SUQUAMISH TRIBE LEGAL DEPARTMENT

PO Box 498

Suquamish, WA 98392

Co–Counsel for the Suquamish Tribe

By: s/ REGINA E. HOVET

Regina E. Hovet, WSBA # 33654

SAUK–SUIATTLE INDIAN TRIBE

5318 Chief Brown Lane

Darrington, WA 98241

Co–Counsel for the Sauk–Suiattle Tribe

By: s/ SAM STILTNER

Sam Stiltner, WSBA # 7765

880

LAW OFFICE, PUYALLUP TRIBE

3009 Portland Ave.

Tacoma, WA 98404

Counsel for the Puyallup Tribe

By: s/ DANIEL A. RAAS

Daniel A. Raas, WSBA # 4970

Harry L. Johnsen, WSBA # 4955

Mary M. Neil, WSBA # 34348

RAAS, JOHNSEN & STUEN, P.S.

1503 E Street

PO Box 5746

Bellingham, WA 98227

Counsel for the Lummi Indian Nation

By: s/ BILL TOBIN

Bill Tobin, WSBA # 4397

LAW OFFICE OF BILL TOBIN

PO Box 1425

Vashon, WA 98070

Co–Counsel for the Nisqually Indian Tribe

By: s/ ALAN C. STAY

Robert L. Otsea, Jr., WSBA # 9367

Alan C. Stay, WSBA # 4569

Richard Reich, WSBA # 8178

OFFICE OF THE TRIBAL ATTORNEY

39015 172nd Ave., S.E.

Auburn, WA 98002

Counsel for the Muckleshoot Tribe

By: s/ LAUREN P. RASMUSSEN

Lauren P. Rasmussen, WSBA # 33256

GENDLER & MANN, LLP

1424 4th Ave., Suite 1015

Seattle, WA 98101

Co–Counsel for the Port Gamble and Jamestown S'Klallam Indian Tribes

By: s/ RICHARD BERLEY

Marc Slonim, WSBA # 11181

John Arum, WSBA # 19813

Richard Berley, WSBA # 9209

Brian Gruber, WSBA # 32210

ZIONTZ CHESTNUT, et al.

2101 Fourth Ave., Suite 1230

Seattle, WA 98121

Counsel for the Makah Tribe

By: s/ EDWARD J. WURTZ

Edward J. Wurtz, General Counsel, WSBA # 24741

NOOKSACK INDIAN TRIBE

5048 Mt. Baker Highway

PO Box 157

Deming, WA 98244

Counsel for the Nooksack Tribe

By: s/ HAROLD CHESNIN

Harold Chesnin, WSBA # 398

David Hawkins, WSBA # 35370

UPPER SKAGIT INDIAN TRIBE

25944 Community Plaza Way

Sedro Woolley, WA 98284

Counsel for the Upper Skagit Tribe

THE UNITED STATES OF AMERICA, Plaintiff

By: s/ PETER C. MONSON

Peter C. Monson

United States Department of Justice

Environment and Natural Resources Division

Indian Resources Section

1961 Stout Street, 8th Floor

Denver, CO 80294

THE STATE OF WASHINGTON, Defendant

Rob McKenna

Attorney General of Washington

By: s/ MICHAEL S. GROSSMANN

Michael S. Grossmann, WSBA # 15293

Senior Counsel

By: s/ JOSEPH V. PANESKO

Joseph V. Panesko

Assistant Attorney General, WSBA # 25289

Intervenor–Defendant PUGET SOUND SHELLFISH GROWERS,

By: s/ MICHAEL HIMES

Michael Himes, WSBA # 19423

Charles C. Sipos, WSBA # 32825

Perkins Coie LLP

THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs,

v.

STATE OF WASHINGTON, et al., Defendants.

NO. C70–9213

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

[PROPOSED] ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT

IT IS HEREBY ORDERED:

The Court, having considered the Joint Motion For Order Approving Consent Decree and Settlement Agreement, which addresses the geoduck portion of this minimum density dispute resolution proceeding, finds that the Consent Decree and Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Consent Decree and Settlement Agreement is hereby entered and approved.

DONE this ____ day of _____, 2007.

_____

Honorable Ricardo S. Martinez

United States Judge, U.S. District Court

Western District of Washington

JOINT MOTION FOR ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT RE MANILA CLAMS, NATIVE LITTLENECK CLAMS AND PACIFIC OYSTERS

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

Note On Motion Calendar: June 29, 2007

(June 29, 2007)

The Parties identified below seek this Court's entry of an Order that approves the Parties' Consent Decree And Settlement Agreement Re Manila Clams, Native Littleneck Clams and Pacific Oysters, attached hereto as Exhibit A. The Parties to the Consent Decree and Settlement Agreement are as follows:

Plaintiff Indian Tribes: Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown S'Klallam, Suquamish and Swinomish ("Tribes");

Plaintiff United States of America;

Defendant State of Washington; and

Intervenor–Defendant Puget Sound Shellfish Growers: Taylor United, Inc.; Olympia Oyster Company; G.R. Clam & Oyster Farm; Cedric E. Lindsay; Minter-

brook Oyster Company; Charles and Willa Murray; Skookum Bay Oyster Company; and J & G Gunstone Clams, Inc. ("Growers").

The undersigned representatives of the Parties affirm and agree that the Consent Decree and Settlement Agreement is fair and reasonable and, by the signatures of their representatives below, the Parties consent to and are fully bound by all its terms.

Each undersigned representative of the Parties to this Consent Decree and Settlement Agreement certifies that he or she is fully authorized by that Party to enter into and execute the terms and conditions of this Joint Motion for Order Approving Consent Decree and Settlement Agreement, and to legally bind such Party to the Order and the Settlement Agreement. By their representatives' signatures below, the Parties consent to the entry of the Order Approving the Consent Decree and Settlement Agreement.

## EXHIBIT A

HONORABLE RICARDO MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs,

vs.

STATE OF WASHINGTON, et al., Defendants

Case No.: C70–9213

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

CONSENT DECREE AND SETTLEMENT AGREEMENT RE MANILA CLAMS, NATIVE LITTLENECK CLAMS AND PACIFIC OYSTERS

The Tribes listed in section 1 below ("Tribes"), the Intervenor–Defendant Puget Sound Shellfish Growers ("Growers"), and the State of Washington, by and through their undersigned counsel of record, hereby submit this Consent Decree and Settlement Agreement to this Court for its approval.

**WHEREAS** the Tribes have asserted treaty right claims to take shellfish from tidal and sub-tidal lands owned within the case area in Washington State, which claims have resulted in the following decisions and orders:

1. *United States v. Washington*, 873 F.Supp. 1422 (W.D.Wash.1994).

2. *United States v. Washington*, 898 F.Supp. 1453 (W.D.Wash.1995) (establishing a Shellfish Implementation Plan-hereinafter the "Shellfish Implementation Plan").

3. *United States v. Washington*, 909 F.Supp. 787 (W.D.Wash.1995).

4. *United States v. Washington*, 157 F.3d 630 (9th Cir.1998).

5. A Stipulation And Order Amending Shellfish Implementation Plan, dated April 8, 2002) (hereinafter the "Revised Shellfish Implementation Plan");

**WHEREAS** the Revised Shellfish Implementation Plan envisions the development of "Exhibit A," a table of shellfish density values for several species of shellfish, in several regions, and for multiple time periods, the purpose of which is to implement the "staked or cultivated" proviso of the various Stevens Treaties (the "Shellfish Proviso") as further articulated in the opinions and orders under *United States v. Washington;*

**WHEREAS** the parties are currently engaged in a dispute resolution sub-pro-

ceeding to establish density values in Exhibit A for four species of shellfish (*i.e.*, geoduck, pacific oysters, manila clams and native littleneck clams); and

**WHEREAS** the parties have reached a separate Consent Decree and Settlement to address the density values for geoduck; and

**WHEREAS** previously the parties also have agreed to a Settlement Agreement that would resolve the Tribes' claims to take shellfish on qualifying Growers' properties held as of August 28, 1995, subject to the fulfillment of certain contingencies spelled out in section 9A of that Settlement Agreement (hereinafter "Shellfish Settlement Agreement"); and

**WHEREAS** the Tribes, the Growers and the State of Washington are interested in resolving any and all disputes between and among them regarding both the appropriate density value to be applied under Exhibit A to aquaculture proposals for manila clams, native littleneck clams and pacific oysters since August 28, 1995 and into the future, and the appropriate allocation of the natural production of those same species if a natural bed is determined to exist.

**Now Therefore,** in the interest and spirit of cooperation, the parties hereby enter into this Consent Decree and Settlement Agreement and agree to the following:

## CONSENT DECREE AND SETTLEMENT AGREEMENT

### 1. TRIBES.

The Tribes bound by this Consent Decree and Settlement Agreement are the Tulalip, Stillaguamish, Sauk Suiattle, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Skokomish, Port Gamble S'Klallam, Lower Elwha Klallam, Jamestown SKIallam, and Suquamish Tribes, the Lummi Nation, and the Swinomish Indian Tribal Community (collectively hereinafter "Tribes") and any other tribe that may be added by agreement or by subsequent order of this Court. The Tribes are parties to the following treaties: Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132); Treaty of Point Elliott, January 26, 1855 (12 Stat. 927); Treaty of Point No Point, January 26, 1855 (12 Stat. 933); Treaty with the Makah, January 31, 1855 (12 Stat. 939) (hereafter "the treaties").

### 2. CONTINGENT NATURE OF THIS AGREEMENT.

This Consent Decree and Settlement Agreement is contingent upon the successful fulfillment of all contingencies stated in Section 9A of the Shellfish Settlement Agreement between the Tribes, the Growers, the State of Washington and the United States Department of the Interior regarding the Tribes' claims of rights to take shellfish from tidelands covered by that Settlement Agreement. In the event that any contingency stated in Section 9A of that Settlement Agreement fails to be fulfilled this Consent Decree and Settlement Agreement shall be null and void without further action by the Parties or Order of the Court. In the event that this Consent Decree and Settlement Agreement becomes null and void the parties shall comply with the existing order regarding the trial schedule for this subproceeding.

This Consent Decree and Settlement Agreement shall not be filed with the Court for approval unless and until all aforementioned contingencies stated in Section 9A of the Shellfish Settlement Agreement are fulfilled. Once all contingencies stated in Section 9A of the Shellfish Settlement Agreement are fulfilled,

and the Court has approved this Consent Decree and Settlement Agreement, this Consent Decree and Settlement Agreement shall become final and binding as of the date of the Court's approval.

## 3. DURATION OF THIS AGREEMENT.

The minimum densities established in sections 6 and 7 of this Consent Decree and Settlement Agreement, and the other provisions of this Consent Decree and Settlement Agreement that provide for the application of those density levels to new aquaculture activities, shall apply as of August 28, 1995, and continue from that date forward until 25 years from the effective date of this Consent Decree and Settlement Agreement, unless extended by mutual agreement of the parties or by the terms of this section. At the expiration of 25 years this Consent Decree and Settlement Agreement shall continue in effect unless and until (a) a party gives at least one year's notice of intent to terminate this Consent Decree and Settlement Agreement with respect to one or more species covered by this Consent Decree and Settlement Agreement, and (b) initiates litigation to establish different minimum densities for that or those species. In the event that a party gives notice of intent to terminate this Consent Decree and Settlement Agreement, and if no new agreement is reached by the date specified in the notice to terminate, this Consent Decree and Settlement Agreement will continue in force until the Court issues a decision establishing new minimum densities. If litigation is initiated to change the minimum density with respect to only some species or some regions, this Consent Decree and Settlement Agreement shall continue in force and effect with respect to all species and all areas not subject to the litigation initiated to establish new minimum densities.

## 4. NATURAL BED STATUS TO BE DETERMINED BY DENSITY.

The existence of a natural bed of manila clams, native littleneck clams, or pacific oysters, for purposes of Exhibit A and section 6 of the Revised Shellfish Implementation Plan, will be decided on the basis of whether it meets or exceeds the minimum density specified in this Consent Decree and Settlement Agreement, without regard to how long it may take a particular bed to return to a minimum density after harvest. However, the determination of whether a natural bed exists is subject to whether or not the bed is of sufficient size or has a sufficient number of shellfish to constitute a natural bed. Whether a bed of a particular size or containing a particular quantity of shellfish is or is not a natural bed remains an open issue to be resolved through agreement or by dispute resolution on a bed-by-bed basis.

## 5. DEFINITION OF AREAS.

In lieu of the geographic areas specified in Exhibit A to the Revised Shellfish Implementation Plan, the following areas, as defined below, shall control for purposes of this Consent Decree and Settlement Agreement:

 **a.** Area 1 is defined as all waters west of a line from Johnson Point to Devils Head.

 **b.** Area 2 is defined as all waters south of the Tacoma Narrows Bridge to the Johnson Point/Devils Head line.

 **c.** Area 3 is defined as all waters of Hood Canal south of the Hood Canal Bridge.

 **d.** Area 4 is defined as all remaining waters east of the west end of the

Strait of Juan de Fuca not included within Areas f, 2 or 3.

## 6. MINIMUM DENSITIES FOR MANILA CLAMS AND NATIVE LITTLENECK CLAMS.

For each year during which this Consent Decree and Settlement Agreement is in effect, the minimum density for both mature, marketable manila clams and mature, marketable native littleneck clams is as follows:

a. For Area 1, 0.14 pounds per square foot.

b. For Area 2, 0.10 pounds per square foot.

c. For Area 3, 0.11 pounds per square foot.

d. For Area 4, 0.07 pounds per square foot.

While the minimum density is the same for both manila and native littleneck clams, each species is to be measured separately.

## 7. MINIMUM DENSITY FOR PACIFIC OYSTERS.

For each year during which this Consent Decree and Settlement Agreement is in effect, the minimum density for pacific oysters is 0.33 mature, marketable pacific oysters per square foot. This minimum density applies only in Hood Canal, defined for purposes of this section as the waters south of a line from Olele Point to Foulweather Bluff. If a Tribe contends that sustainable natural production of oysters occurs outside of Hood Canal, a Tribe that is party to this Agreement may, pursuant to the terms of Section 11 below, seek application of the minimum density set forth in this Section for those areas.

## 8. NATURAL PRODUCTION.

Where a natural bed on a Grower's property has been established by the existence of a density equal to or greater than the minimum density specified for that species in sections 4, 5, 6 and/or 7 above, the natural production of that bed shall be shared with Tribes according to the relevant allocation period as specified below in section 9 or 10. The natural production to be shared shall be the quantity of the mature, marketable shellfish of the relevant species determined to be present on the bed for purposes of the measurement of density used to determine the existence of the natural bed.

## 9. ALLOCATION PERIOD FOR MANILA CLAMS AND NATIVE LITTLENECK CLAMS.

The allocation period for manila clams and native littleneck clams is three years. In other words, where a natural bed of manila clams or native littleneck clams exists on a Grower's property, the Tribes will be entitled to either one-third of 50% of the natural production of mature harvestable manila or littleneck clams each year, or the entire 50% of the natural production once every three years, at the Grower's option, or such other equivalent arrangement as the parties may agree, provided that the Tribes shall be permitted to harvest manila clams and native littleneck clams within one year of the initial determination that a natural bed exists, unless the parties agree otherwise. The grower shall elect the allocation arrangement within the first year after the determination that a natural bed exists and that arrangement shall control future harvest allocation and timing unless the parties agree otherwise.

## 10. ALLOCATION PERIOD FOR PACIFIC OYSTERS.

The allocation period for pacific oysters is four years. In other words, where a natural bed of pacific oysters exists on a Grower's property, the Tribes' will be entitled to either one-fourth of 50% of the natural production of mature harvestable pacific oysters each year, or the entire 50% of the natural production once every four years, at the Grower's option, or such other equivalent arrangement as the parties may agree, provided that the Tribes shall be permitted to harvest pacific oysters within one year of the initial determination that a natural bed exists, unless the parties agree otherwise. The grower shall elect the allocation arrangement within the first year after the determination that a natural bed exists and that arrangement shall control future harvest allocation and timing unless the parties agree otherwise.

## 11. MODIFICATION OF ALLOCATION PERIODS.

The allocation periods established by sections 9 and 10 above, and the amount of the natural production to be allocated, shall continue in force for the term of this Consent Decree and Settlement Agreement, unless either a Grower or a Tribe shows that natural production has changed pursuant to section 6.1.4 of the Revised Shellfish Implementation Plan.

Respectfully submitted this 29th day of June, 2007.

PLAINTIFF INDIAN TRIBES,

By: s/ PHILLIP E. KATZEN

Phillip E. Katzen, WSBA # 7835

Cory J. Albright, WSBA # 31493

KANJI & KATZEN, PLLC

100 S. King Street, Suite 560

Seattle, WA 98104

Counsel for the Suquamish, Jamestown S'Klallam, Lower Elwha Klallam, Port Gamble S'Klallam, Nisqually, Sauk–Suiattle, Skokomish, Squaxin Island, and Stillaguarnish Tribes

By: s/ MASON D. MORISSET

Mason D. Morisset, WSBA # 273

MORISSET, SCHLOSSER, et al.

801 Second Ave., Suite 1115

Seattle, WA 98104

Counsel for the Tulalip Tribes

By: s/ LORI E. NIES

Lori E. Nies, WSBA # 26652

SKOKOMISH INDIAN TRIBE

North 80 Tribal Center Rd.

Skokomish Nation, WA 98584

Co–Counsel for the Skokomish Indian Nation

By: s/ ALIX FOSTER

Alix Foster, WSBA # 4943

SWINOMISH INDIAN TRIBAL COMMUNITY

PO Box 817

LaConner, WA 98257

Counsel for the Swinomish Indian Tribal Community

By: s/ KEVIN R. LYON

Kevin R. Lyon, WSBA # 15076

SQUAXIN ISLAND LEGAL DEPARTMENT

SE 3711 Old Olympic Hwy.

Shelton, WA 98584

Co–Counsel for the Squaxin Island Tribe

By: s/ MICHELLE HANSEN

Michelle Hansen, WSBA # 14051

SUQUAMISH TRIBE LEGAL DEPARTMENT

PO Box 498

Suquamish, WA 98392

Co–Counsel for the Suquamish Tribe

By: s/ REGINA E. HOVET

Regina E. Hovet, WSBA # 33654

SAUK–SUIATTLE INDIAN TRIBE

5318 Chief Brown Lane

Darrington, WA 98241

Co–Counsel for the Sauk–Suiattle Tribe

By: s/LORI E. NIES

Lori E. Nies, WSBA # 26652

SKOKOMISH INDIAN TRIBE

North 80 Tribal Center Rd.

Skokomish Nation, WA 98584

Co–Counsel for the Skokomish Indian Nation

By: s/ALIX FOSTER

Alix Foster, WSBA # 4943

SWINOMISH INDIAN TRIBAL COMMUNITY

PO Box 817

LaConner, WA 98257

Counsel for the Swinomish Indian Tribal Community

By: s/KEVIN R. LYON

Kevin R. Lyon, WSBA # 15076

SQUAXIN ISLAND LEGAL DEPARTMENT

SE 3711 Old Olympic Hwy.

Shelton, WA 98584

Co–Counsel for the Squaxin Island Tribe

By: s/MICHELLE HANSEN

Michelle Hansen, WSBA # 14051

SUQUAMISH TRIBE LEGAL DEPARTMENT

PO Box 498

Suquamish, WA 98392

Co–Counsel for the Suquamish Tribe

By: s/REGINA E. HOVET

Regina E. Hovet, WSBA # 33654

SAUK–SUIATTLE INDIAN TRIBE

5318 Chief Brown Lane

Darrington, WA 98241

Co–Counsel for the Sauk–Suiattle Tribe

By: s/SAM STILTNER

Sam Stiltner, WSBA # 7765

LAW OFFICE, PUYALLUP TRIBE

3009 Portland Ave.

Tacoma, WA 98404

Counsel for the Puyallup Tribe

By: s/MARRY M. NEIL

Daniel A. Raas, WSBA # 4970

Harry L. Johnsen, WSBA # 4955

Mary M. Neil, WSBA # 34348

RAAS, JOHNSEN & STUEN, P.S.

1503 E Street

PO Box 5746

Bellingham, WA 98227

Counsel for the Lummi Indian Nation

By: s/BILL TOBIN

Bill Tobin, WSBA # 4397

LAW OFFICE OF BILL TOBIN

PO Box 1425

Vashon, WA 98070

Co–Counsel for the Nisqually Indian Tribe

By: s/ALAN C. STAY

Robert L. Otsea, Jr., WSBA # 9367

Alan C. Stay, WSBA # 4569

Richard Reich, WSBA # 8178

OFFICE OF THE TRIBAL ATTORNEY

39015 172nd Ave., S.E.

Auburn, WA 98002

Counsel for the Muckleshoot Tribe

By: s/LAUREN P. RASMUSSEN

Lauren P. Rasmussen, WSBA # 33256

GENDLER & MANN, LLP

1424 4th Ave., Suite 1015

Seattle, WA 98101

Co–Counsel for the Port Gamble and Jamestown S'Klallam Indian Tribes

By: s/RICHARD BERLEY

Marc Slonim, WSBA # 11181

John Arum, WSBA # 19813

Richard Berley, WSBA # 9209

Brian Gruber, WSBA # 32210

ZIONTZ CHESTNUT, et al.

2101 Fourth Ave., Suite 1230

Seattle, WA 98121

Counsel for the Makah Tribe

By: s/EDWARD J. WURTZ

Edward J. Wurtz, General Counsel, WSBA # 24741

NOOKSACK INDIAN TRIBE

5048 Mt. Baker Highway

PO Box 157

Deming, WA 98244

Counsel for the Nooksack Tribe

By: s/HAROLD CHESNIN

Harold Chesnin, WSBA # 398

David Hawkins, WSBA # 35370

UPPER SKAGIT INDIAN TRIBE

25944 Community Plaza Way

Sedro Woolley, WA 98284

Counsel for the Upper Skagit Tribe

THE UNITED STATES OF AMERICA, Plaintiff

By: s/PETER C. MONSON

Peter C. Monson

United States Department of Justice

Environment and Natural Resources Division

Indian Resources Section

1961 Stout Street, 8th Floor

Denver, CO 80294

THE STATE OF WASHINGTON, Defendant

Rob McKenna

Attorney General of Washington

By: s/MICHAEL S. GROSSMANN

Michael S. Grossmann, WSBA # 15293

Senior Counsel

By: s/JOSEPH V. PANESKO

Joseph V. Panesko

Assistant Attorney General, WSBA# 25289

Intervenor–Defendant PUGET SOUND SHELLFISH GROWERS,

By: s/MICHAEL HIMES

Michael Himes, WSBA # 19423

Charles C. Sipos, WSBA # 32825

Perkins Coie LLP

THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs,

v.

STATE OF WASHINGTON, et al., Defendants.

NO. C70–9213

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

[PROPOSED] ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT RE MANILA CLAMS, NATIVE LITTLENECK CLAMS AND PACIFIC OYSTERS

IT IS HEREBY ORDERED:

The Court, having considered the Joint Motion For Order Approving Consent Decree and Settlement Agreement, which addresses the geoduck portion of this minimum density dispute resolution proceeding, finds that the Consent Decree and Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Consent Decree and Settlement Agreement is hereby entered and approved.

DONE this ____ day of _____, 2007.

_____

Honorable Ricardo S. Martinez

United States Judge, U.S. District Court

Western District of Washington

## ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

(July 11, 2007)

IT IS HEREBY ORDERED:

■ The Court, having considered the Joint Motion For Order Approving Consent Decree and Settlement Agreement, which addresses the geoduck portion of this minimum density dispute resolution proceeding, finds that the Consent Decree and Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Consent Decree and Settlement Agreement is hereby entered and approved.

## ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT RE MANILA CLAMS, NATIVE LITTLENECK CLAMS AND PACIFIC OYSTERS

Subproceeding No. 89–3–01 (Shellfish Minimum Density)

(July 11, 2007)

IT IS HEREBY ORDERED:

■ The Court, having considered the Joint Motion For Order Approving Consent Decree and Settlement Agreement Re Manila Clams, Native Littleneck Clams and Pacific Oysters, finds that the Consent Decree and Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Consent Decree and Settlement Agreement is hereby entered and approved.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

Subproceeding No. 01–1

(August 22, 2007)

This matter was initiated by a Request for Determination ("Request") filed in 2001 by plaintiffs Suquamish Indian Tribe, Jamestown S'Klallam, Lower Elwha Band of Klallam, Port Gamble Clallam, Nisqually Indian Tribe, Nooksack Tribe, Sauk–Suiattle Tribe, Skokomish Indian Tribe, Squaxin Island Tribe, Stillaguamish Tribe, Upper Skagit Tribe, Tulalip Tribe, Lummi Indian Nation, Quinault Indian Nation, Puyallup Tribe, Hoh Tribe, Confederated Bands and Tribes of the Yakama Indian Nation, Quileute Indian Tribe, Makah Nation, Swinomish Tribal Community, and

Muckleshoot Indian Tribe (hereafter, "the Tribes"). It is now before the Court for consideration of cross-motions for summary judgment filed by defendant State of Washington ("State") and by the plaintiff Tribes.[1] Dkt. ##287, 295. Oral argument was heard on the motions on February 1, 2007. The parties were then referred to the Honorable J. Kelley Arnold, United Magistrate Judge, for a settlement conference. The Court was advised on May 10, 2007 that the mediation was unsuccessful, and the matter was ripe for issuance of a decision on the summary judgment motions. The matter is set for trial on September 24, 2007.

The memoranda, exhibits, and arguments of the parties have been fully considered by the Court, as has the prior case history. For the reasons set forth below, the Court shall grant the Tribes' motion for partial summary judgment, and shall deny the summary judgment motion filed by the State of Washington.

## BACKGROUND

This is a designated subproceeding of *United States, et al. v. State of Washington, et al.*, C709213. The United States, in conjunction with the Tribes, initiated this sub-proceeding in early 2001, seeking to compel the State of Washington to repair or replace any culverts that are impeding salmon migration to or from the spawning grounds. The Request for Determination, filed pursuant to the permanent injunction in this case, maintains that the State has a treaty-based duty to preserve fish runs so that the Tribes can earn a "moderate living". The State's original Answer asserted cross- and counter-Requests for Determination, claiming injunctive and declaratory relief against the

United States for placing a disproportionate burden of meeting the treaty-based duty (if any) on the State. The State also asserted that the United States has managed its own lands in such a way as to create a nuisance that unfairly burdens the State.

In 2001, the United States moved to dismiss the counterclaims, contending that it has not waived sovereign immunity with respect to these claims, and that the State lacks standing to assert tribal rights derived from the Treaties. The Court originally denied the motion to dismiss, but upon reconsideration the motion to dismiss the counterclaims was granted. The Court found that it lacked jurisdiction over the State's counterclaims because sovereign immunity has not been waived. A subsequent motion by the State for leave to file an amended Answer asserting counter-claims was denied. These cross-motions for summary judgment followed.

The parties have cooperated fully with one another throughout these proceedings, including discovery and settlement negotiations. They agree that material facts are not in dispute. Nevertheless, they have been unable to arrive at a settlement, and now ask the Court to resolve the legal issues presented.

## DISCUSSION

This subproceeding arises from the language in Article III of the 1855 Treaty of Point Elliott ("Stevens Treaties") in which the Tribes were promised that "[t]he right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory ..." Dkt. # 287–2. The

---

1. Plaintiff United States of America has substantially joined in the Tribes' opposition to

the State's motion. Dkt. # 313.

Tribes, in their Request for Determination, state that they brought this action

> to enforce a duty upon the State of Washington to refrain from constructing and maintaining culverts under State roads that degrade fish habitat so that adult fish production is reduced, which in turn reduces the number of fish available for harvest by the Tribes. In part due to the reduction of harvestable fish caused by those actions of the State, the ability of the Tribes to achieve a moderate living from their Treaty fisheries has been impaired.

Request for Determination, Dkt. # 1, p. 1.

The Tribes requested mandatory relief "requiring Washington to identify and then to open culverts under state roads and highways that obstruct fish passage, for fish runs returning to or passing through the usual and accustomed grounds and stations of the plaintiff tribes." [2] *Id.* Specifically, they request a declaratory judgment, establishing that (1) the right of taking fish secured by the Treaties imposes a duty upon the State of Washington to refrain from diminishing the number of fish passing through, or to or from, the Tribes' usual and accustomed fishing grounds by improperly constructing or maintaining culverts under State-owned roads and highways; and that (2) the State has violated, and continues to violate, the duty owed the Tribes under the Stevens Treaties. Further, the Tribes request a prohibitory injunction, prohibiting the State of Washington and its agencies from constructing or maintaining any culverts that reduce the number of fish that would otherwise return to or pass through the usual and accustomed fishing grounds of the Tribes. Finally, they request a mandatory injunction, requiring the State to (1) identify, within eighteen months, the location of all culverts constructed or maintained by State agencies, that diminish the number of fish in the manner set forth above, and (2) fix, within five years after judgment, and thereafter maintain all culverts built or maintained by any State agency, so that they do not diminish the number of fish as set forth above. *Id.,* pp. 6–7.

The State has moved for summary judgment as to all aspects of the Request. The Tribes have moved for partial summary judgment as to the declaratory judgment portion of their Request. Shortly before the February 1, 2007 hearing, the parties stipulated to define the scope of this subproceeding to include "only those culverts that block fish passage under State-owned roads." Dkt. # 341. Therefore, culverts that do not actually block fish passage, as well as tidegates, are not within the scope of this subproceeding. *Id.* ;

The Tribes, in their Request, assert that between 1974, the year that this case was originally decided, and 1986, Tribal harvests of anadromous fish (salmon and steelhead) rose dramatically, eventually reaching some 5 million fish. Then harvests declined, so that by 1999 harvests were back down to the 1974 levels.[3] The

---

**2.** According to testimony and exhibits provided by the Tribes, culverts may become impassable to fish either because they are blocked by silt or debris, or because they are "perched"—that is, the outfall of the culvert is several feet or more above the level of the stream into which it flows. Salmon migrating upstream to spawn are stopped by a perched culvert and cannot reach their spawning grounds.

**3.** These figures are supported by the Declaration of Keith Lutz, a fisheries biologist with the Northwest Indian Fisheries Commission, filed in support of the Tribes' motion for partial summary judgment. The table presented by Mr. Lutz indicates that harvest levels in 1974 and 1975 were 860,537 and 1,001,041 fish respectively. The number of fish harvested rose steadily to 5,494,973 in 1985. Numbers of fish harvested then fluctuated between

Tribes contend that "[a] significant reason for the decline of harvestable fish has been the destruction and modification of habitat needed for their survival." Request for Determination, Dkt. # 1, ¶¶ 2.5, 2.6, 2.7.

The Request addresses one specific type of habitat modification: the placement of culverts rather than bridges where roadways cross rivers and streams. The Tribes allege that when such culverts are improperly built or maintained, they block fish passage up or down the stream, "thereby preventing out-migration of juvenile fish to rearing areas or the salt water, or the return of adult fish to spawning beds, or both." *Id.*, ¶ 3.1. According to the Tribes, culverts under State-owned or maintained roads block fish access to at least 249 linear miles of stream, thus closing off more than 400,000 square meters of productive spawning habitat, and more than 1.5 million square meters of productive rearing habitat for juvenile fish. *Id.*, ¶ 3.7. The Tribes state that, by the State's own estimates, removal of the obstacles presented by blocked culverts would result in an annual increase in production of 200,-000 fish, many of which would be available for Tribal harvest. *Id.*, ¶ 3.8.

The State does not dispute the fact that a certain number of culverts under State-owned roads present barriers to fish migration. The State notes that 18% of the culverts on land managed by the Department of Natural Resources ("DNR") were identified as barriers in a 2000 inventory. Washington State Parks ("WDP") have identified 120 culverts as fish passage barriers. And of the thousands of culverts passing under roads maintained by the Washington State Department of Transportation ("WSDOT"), the State asserts that "most", but not all, allow free passage of migrating fish—meaning that many do not.[4] Motion for Summary Judgment, pp. 8–11.

The State argues that the Tribes have produced no evidence that the blocked culverts "affirmatively diminish[ ] the number of fish available for harvest". State's Reply, Dkt. # 319, p. 2. The Tribes have, however, produced evidence of greatly diminished fish runs. While there may be other contributing causes for this, the conclusion is inescapable that if culverts block fish passage so that they cannot swim upstream to spawn, or downstream to reach the ocean, those blocked culverts are responsible for some portion of the diminishment. It is not necessary for the Tribes to exactly quantify the numbers of "missing" fish to proceed in this matter.

The issue then becomes a purely legal one: whether the Tribes' treaty-based right of taking fish imposes upon the State a duty to refrain from diminishing fish runs by constructing or maintaining culverts that block fish passage. The State asserts that this question has already been answered, and the Tribes' position reject-

approximately three and four million fish for the next several years, higher in the odd-numbered years when large numbers of pink salmon were harvested. After 1991, harvests of four million fish were not seen again, and after the 1993 harvest of 3,497,537 fish the numbers declined dramatically, dipping as low as 575,958 in 1999. While post–1999 harvest numbers have risen somewhat, to 2,148,802 fish taken in 2003, the Tribal harvest through 2004 (the last year reported in this exhibit) remained less than half that of

the years 1985 to 1991. Declaration of Kieth Lutz, Dkt. # 299.

4. Although the State's motion did not set the number, an expert declaration filed in support of the Tribe's motion found 1,113 barrier culverts in the combined jurisdiction of the WSDOT and the Washington Department of Fish and Wildlife ("WDFW"), in addition to those included in the WDP and DNR culvert counts. Declaration of Ronald McFarlane, Dkt. # 300, ¶ 8.

ed, by the Ninth Circuit Court of Appeals. However, that is not a correct characterization of the appellate court's prior rulings in this matter.

In 1976, after the Tribes won recognition of their treaty-based right to a fair and equitable share of harvestable fish in Phase I of this case, this Court turned to address environmental issues raised earlier. One of two questions addressed by the Court in Phase II was "whether the right of taking fish incorporates the right to have treaty fish protected from environmental degradation." *United States v. Washington*, 506 F.Supp. 187, 190 (1980). The district court held that "implicitly incorporated in the treaties' fishing clause is the right to have the fishery habitat protected from man-made despoilation." *Id.* at 203. The Court then assigned to the State a burden "to demonstrate that any environmental degradation of the fish habitat proximately caused by the State's actions (including the authorization of third parties' activities) will not impair the tribes' ability to satisfy their moderate living needs." *Id.* at 207.

The Ninth Circuit Court of Appeals reversed this portion of the district court's order, but not as conclusively as the State suggests.

Let us repeat the essence of our interpretation of the treaty. Although we reject the environmental servitude created by the district court, we do not hold that the State of Washington and the Indians have no obligations to respect the other's rights in the resource Instead, ... we find on the environmental issue that the State and the Tribes must each take reasonable steps commensurate with the resources and abilities of each to preserve and enhance the fishery when their projects threaten then-existing levels.

*United States v. Washington*, 694 F.2d 1374, 1389 (9th Cir.1982).

Upon request for rehearing *en banc*, the three-judge panel's opinion was vacated. *United States v. Washington*, 759 F.2d 1353, 1354 (9th Cir.1985). A highly divided eleven—member court issued a *per curiam* decision vacating the district court's declaratory judgment on the environmental issue. The court's order did not contain broad and conclusive language necessary to reject the idea of a treaty—based duty in theory as well as in practice. Instead, the Court found that the declaratory judgment on environmental issues was imprecise and lacking in a sufficient factual basis.

We choose to rest our decision in this case on the proposition that issuance of the declaratory judgment on the environmental issue is contrary to the exercise of sound judicial discretion. The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon **concrete facts which underlie a dispute in a particular case.** Legal rules of general applicability are announced when their consequences are known and understood in the case before the court, not when the subject parties and the court giving judgment are left to guess at their meaning. It serves neither the needs of the parties, nor the jurisprudence of the court, nor the interests of the public for the judiciary to employ the declaratory judgment procedure to announce legal rules imprecise in definition and uncertain in dimension. Precise resolution, not general admonition, is the function of declaratory relief. These necessary predicates for a declaratory judgment have

not been met with respect to the environmental issues in this case.

The State of Washington is bound by the treaty. If the State acts for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty as interpreted by past decisions, it will be subject to immediate correction and remedial action by the courts. In other instances, **the measure of the State's obligation will depend for its precise legal formulation on all of the facts presented by a particular dispute.**

*Id.* at 1357 (emphasis added).

The appellate court's ruling, then, cannot be read as rejecting the concept of a treaty-based duty to avoid specific actions which impair the salmon runs. The court did not find fault with the district court's analysis on treaty-based obligations, but rather vacated the declaratory judgment as too broad, and lacking a factual basis at that time.[5] The court's language, however, clearly presumes some obligation on the part of the State; not a broad "general admonition" as originally imposed by the district court, but a duty which could be defined by concrete facts presented in a particular dispute. This dispute, limited as it is to "only those culverts that block fish passage under State-owned roads", is capable of resolution through the declaratory relief requested by the tribes. The Tribes have presented sufficient facts, in the form of fish harvest data and numbers of blocked culverts, to meet the appellate court's stated requirements for issuance of a declaratory judgment. A narrowly-crafted declaratory judgment such as the one requested here does not raise the specter of a broad "environmental servitude" so feared by the State.

In moving for summary judgment, the State also asserts that "[n]o treaty language supports 'moderate living' as the measure of any servitude". Motion for Summary Judgment, p. 16. The State argues that the Tribes have proposed that the State has a duty to avoid impairing their ability to earn a "moderate living", but no tribal member can define the term "moderate living". The State further asserts that the term "moderate living" does not appear in the treaty, and that since the treaty is a contract, its provisions must be definite in order to be enforceable. According to the State, "the term is inherently ambiguous." Motion for Summary Judgment, p. 17.

The term "moderate living" was coined by the courts, not the parties. It is thus indeed not a part of the treaty "contract";

---

**5.** Neither the majority opinion, nor any of the dissenting or concurring opinions rejected the district court's analysis on treaty-based obligations. Indeed, three of the dissenting judges would have affirmed the district court's declaratory judgment on environmental issues. Judge Nelson flatly stated, "I agree with the district court that the Tribes have an implicit treaty right to a sufficient quantity of fish to provide them with a moderate living, **and the related right not to have the fishery habitat degraded to the extent that the minimum standard cannot be met. I also agree that the State has a correlative duty to refrain from degrading or authorizing others to degrade the fish habitat in such a manner.**" *Id.* at 1367 (emphasis added). Judge Skopil joined in this dissent. *Id.* Judge Norris dissented "for the reasons articulated in Judge Nelson's dissenting opinion." *Id.* at 1368. Judges Sneed and Anderson, who sat on the original three-judge panel and formulated the "reasonable steps" standard set forth above, concurred in the opinion in the interests of collegiality, but did not retreat from the position they took in hearing the case originally. *Id.* at 1360. Judges who concurred in the opinion did so because of the absence or a case or controversy (Judges Ferguson and Schroeder), or because the declaratory judgment was deemed not an appealable decision (Judge Sneed). And nowhere in the majority opinion did the court state that no duty arises from the treaties.

it is an interpretation that has been applied by the courts. In *State of Washington, et al. v. Washington State Commercial Passenger Fishing Vessel Association, et al.,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), the Supreme Court stated,

> We also agree with the Government that an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount....
>
> The division arrived at by the District Court is also consistent with our earlier decisions concerning Indian treaty rights to scarce natural resources. In those cases, after determining that at the time of the treaties the resource involved was necessary to the Indians' welfare, the Court typically ordered a trial judge or special master, in his discretion, to devise some apportionment that assured that the Indians' reasonable livelihood needs would be met. *Arizona v. California,* 373 U.S. [546] at 600, 83 S.Ct. 1468[, 10 L.Ed.2d 542 (1963) ]....
>
> Thus, [the district court] first concluded that at the time the treaties were signed, the Indians, who comprised three-fourths of the territorial population, depended heavily on anadromous fish as a source of food, commerce, and cultural cohesion. Indeed, it found that the non-Indian population depended on Indians to catch the fish that the former consumed. Only then did it determine that the Indians' present-day subsistence and commercial needs should be met, subject, or course, to the 50% ceiling.

> .... As in *Arizona v. California* and its predecessor cases, the central principal here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians **secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living.**

*Id.* at 686, 99 S.Ct. 3055 (citations omitted) (emphasis added).

The State's argument that the term "moderate living" is ambiguous and unenforceable in contract terms is thus without merit. It is neither a "missing term" in the contract, nor a meaningless provision; it is a measure created by the Court. To the extent that it needs definition, it would be for the Court, not the Tribes, to define it. No party has yet asked that the Court do so, and the Court finds it unnecessary at this time. The Tribes' showing that fish harvests have been substantially diminished, together with the logical inference that a significant portion of this diminishment is due to the blocked culverts which cut off access to spawning grounds and rearing areas, is sufficient to support a declaration regarding the culverts' impairment of treaty rights.

In finding a duty on the part of the State to refrain from blocking fish access to spawning grounds and rearing habitat, the Court has been guided by well-established principles of treaty construction. These were set forth as they applied to the treaties at issue here by the Supreme Court in *State of Washington v. Washington State Commercial Passenger Fishing Vessel Association.*

> [I]t is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties. When Indians are involved, this Court has long given special meaning to this rule. It has held that

the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor.

Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and **the Governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent.** It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter "should be excluded from their ancient fisheries", see n. 9, *supra,* and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish. That each individual Indian would share an "equal opportunity" with thousands of newly arrived individual settlers is totally foreign to the spirit of the negotiations. Such a "right", along with the $207,500 paid the Indians, would hardly have been sufficient to compensate them for the millions of acres they ceded to the Territory. Moreover, in light of the far superior numbers, capital resources, and technology of the non-Indians, the concept of the Indians' "equal *opportunity*" to take advantage of a scarce resource is likely in practice to mean that the Indians' "right of taking fish" will net them virtually no catch at all. . . .

*Id.* at 675–677, 99 S.Ct. 3055 (citations omitted; emphasis in bold added, emphasis in italics in original).

After rejecting the State's "equal opportunity" theory, the Court went on to discuss the meaning of "in common with" as used in the treaties.

But we think greater importance should be given to the Indians' likely understanding of the other words in the treaties and especially the reference to the "right of *taking* fish"—a right that had no special meaning at common law but that must have had obvious significance to the tribes relinquishing a portion of their pre-existing rights to the United States in return for this promise. This language is particularly meaningful in the context of anadromous fisheries— which were not the focus of the common law—because of the relative predictability of the "harvest". In this context, it makes sense to say that a party has a right to "take"—rather than merely the "opportunity" to try to catch—some of the large quantities of fish that will almost certainly be available at a given time.

. . . .

This interpretation is confirmed by additional language in the treaties. The fishing clause speaks of "securing" certain fishing rights, a term the Court has previously interpreted as synonymous with "reserving" rights previously exercised. Because the Indians had always exercised the right to meet their subsistence and commercial needs by taking fish from treaty area waters, they would be unlikely to perceive a "reservation" of that right as merely the chance, shared

with millions of other citizens, occasionally to dip their nets in to the territorial waters.

*Id.* at 678–680, 99 S.Ct. 3055 (citations omitted; emphasis in italics in original).

 It was thus the right to **take** fish, not just the right to fish, that was secured by the treaties. The significance of this right to the Tribes, its function as an incentive for the Indians to sign the treaties, and the Tribes' reliance on the unchanging nature of that right, have been set forth in expert declarations provided by the Tribes. Historian Richard White, Ph.D., who has researched the history of the Stevens Treaties, including the intentions, expectations, and understandings of the negotiators on both sides, states that

[o]ne vital part of the relations that Stevens sought to perpetuate was Indian fishing, both for subsistence and for trade. Stevens and the other treaty negotiators knew well that Puget Sound Indians relied heavily on their fisheries. . . .

. . . .

The Indians themselves expressed the importance of fishing to their way of life, and Stevens and the other negotiators assured them of their continued access to the fisheries. Treaty minutes record that at Point–No–Point, One-lun-teh-tat, an "Old Sko-komish Indian" worried how they were to feed themselves once they ceded so much land to the whites, while Hool-hole-tan-akim also wanted to retain half the land. "Why," he asked, "should we sell? We may become destitute. Why not let us live together with you?" In the face of such objections, Benjamin F. Shaw, the interpreter, reassured the Indians that they were "not called upon to give up their old modes of living as places of seeking food, but only to confine their houses to one spot." And Michael Simmons, the special Indi-

an agent for Puget Sound, explained that if they retained a large amount of land they would be confined to it, but that "when a small tract alone was left, the privilege was given of going wherever they pleased to fish and work for the whites." In negotiations at Neah Bay, the Makah raised questions about the role that the fisheries were to play in their future. Stevens replied that "far from wishing to stop their fisheries, he intended to send them oil, kettles and fishing apparatus." What Stevens and his negotiators explicitly promised in response to Indian objections was access to the usual places for procuring food and continued economic exchange with the whites.

. . . .

Stevens also sought to preserve Indian fishing rights to reduce the cost of implementing the treaties. In his instructions to Stevens, Mix had emphasized that whatever the form of the treaties, they should incur minimal expenses for the government. . . . As the Treaty Commissioners noted in their meeting of December 26, 1854, "it was necessary to allow them to fish at all accustomed places" because this "was necessary for the Indians to obtain subsistence." And securing the Indians a subsistence was critical if Stevens was to follow his very clear instructions to keep the cost of the treaty down. By guaranteeing the Indians a right to their share of the bounty of the land, rivers, and Sound, the treaties would enable them to feed themselves at little cost to the government.

Declaration of Richard White, Dkt. # 296, ¶¶ 8, 9, 11.

It was thus the government's intent, and the Tribes' understanding, that they would be able to meet their own subsistence needs forever, and not become a burden on the treasury.

Stevens and the other negotiators believed that the abundant fisheries they had observed in Puget Sound would continue unabated forever. Early white accounts of these fisheries breathlessly reported that they were inexhaustible.... It was not until the 1890's that scientists began to caution that salmon and other stocks might not remain abundant forever.

Stevens and the other negotiators anticipated that Indians would continue to fish the inexhaustible stocks in the future, just as they had in the past. Stevens specifically assured the Indians that they would have access to their normal food supplies now and in the future. At the Point Elliott Treaty, Stevens began by speaking of subsistence. "[A]s for food, you yourselves now, as in time past, can take care of yourselves." The question, however, was not whether they could now feed themselves, but rather whether in the future after the huge cessions that the treaties proposed the Indians would still be able to feed themselves. Stevens assured them that he intended that the treaty guarantee them that they could. **"I want that you shall not have simply food and drink now but that you may have them forever."** The negotiators uniformly agreed on the abundance of the fisheries, the dependence of the Indians upon them, their commercial possibilities, and their future "inexhaustibility." Stevens and Gibbs could both foresee and promote the commercial development of the territory, the creation of a commercial fishery by whites, and the continuation of an Indian fishery. They did not see any contradiction between them.

*Id.* at ¶¶ 13, 14 (emphasis added).

Thus, the Tribes were persuaded to cede huge tracts of land—described by the Supreme Court as "millions of acres"—by the promise that they would forever have access to this resource, which was thought to be inexhaustible. It was not deemed necessary to write any protection for the resource into the treaty because nothing in any of the parties' experience gave them reason to believe that would be necessary. According to historian Joseph E. Taylor II, Ph.D.,

> [d]uring 1854–1855, white settlement had not yet damaged Puget Sound fisheries. During those years, Indians continued to harvest fish for subsistence and trade as they had in the past. Given the slow pace of white settlement and its limited and localized environmental impact, Indians had no reason to believe during the period of treaty negotiations that white settlers would interfere, either directly through their own harvest or indirectly through their environmental impacts, with Indian fisheries in the future. During treaty negotiations, Indians, like whites, assumed that their cherished fisheries would remain robust forever.

Declaration of Joseph Taylor III, Dkt. # 297, ¶ 7.

As Professor White stated, the representatives of the Tribes were personally assured during the negotiations that they could safely give up vast quantities of land and yet be certain that their right to take fish was secure. These assurances would only be meaningful if they carried the implied promise that neither the negotiators nor their successors would take actions that would significantly degrade the resource. Such resource-degrading activities as the building of stream-blocking culverts could not have been anticipated by the Tribes, who themselves had cultural practices that mitigated negative impacts of their fishing on the salmon stocks. Declaration of Robert Thomas Boyd, Dkt. # 298, ¶ 6.

In light of these affirmative assurances given the Tribes as an inducement to sign the Treaties, together with the Tribes' understanding of the reach of those assurances, as set forth by the Supreme Court in the language quoted above, this Court finds that the Treaties do impose a duty upon the State to refrain from building or maintaining culverts in such a manner as to block the passage of fish upstream or down, to or from the Tribes' usual and accustomed fishing places. This is not a broad "environmental servitude" or the imposition of an affirmative duty to take all possible steps to protect fish runs as the State protests, but rather a narrow directive to refrain from impeding fish runs in one specific manner. The Tribes have presented sufficient facts regarding the number of blocked culverts to justify a declaratory judgment regarding the State's duty to refrain from such activity. This duty arises directly from the right of taking fish that was assured to the Tribes in the Treaties, and is necessary to fulfill the promises made to the Tribes regarding the extent of that right.

## CONCLUSION

Accordingly, the State's motion for summary judgment is DENIED. The Tribes' cross-motion for partial summary judgment is GRANTED. The Court hereby declares that the right of taking fish, secured to the Tribes in the Stevens Treaties, imposes a duty upon the State to refrain from building or operating culverts under State-maintained roads that hinder fish passage and thereby diminish the number of fish that would otherwise be available for Tribal harvest. The Court further declares that the State of Washington currently owns and operates culverts that violate this duty.

This matter is currently set for trial on September 24, 2007. In light of this rul-ing, a full trial on the merits is no longer necessary. However, further proceedings are needed to determine an appropriate remedy in this matter, so the September 24 date shall remain on the calendar for such proceedings. Counsel shall appear for a status conference on **Wednesday, August 29, 2007 at 1:30 p.m.** to discuss further proceedings.